**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rhonda Anne McCOY, Defendant–Appellant.**

No. 01–50495.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Decided March 20, 2003.

Angela M. Krueger, Federal Defenders of San Diego, Inc, San Diego, CA, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney (when brief was filed), Carol C. Lam, United States Attorney (when opinion was filed), Anne K. Perry, Assistant United States Attorney, Appellate Section, Criminal Division, San Diego, CA, for the plaintiff-appellee.

Before REINHARDT, TROTT and TASHIMA, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge TROTT.

## OPINION

REINHARDT, Circuit Judge.

Appellant Rhonda McCoy entered a conditional plea of guilty to possession of child pornography after photo shop employees discovered a picture of her and her daughter with their genital areas exposed. Specifically, she reserved the right to appeal on constitutional grounds the denial of her motion to dismiss the charges against her. In her appeal, McCoy challenges the section of the federal statute that prohibits the possession of child pornography made with materials that have traveled in interstate commerce, 18 U.S.C. § 2252(a)(4)(B), asserting that the provision constitutes an unconstitutional exercise of Congress's power under the Commerce Clause.

■ We hold that 18 U.S.C. § 2252(a)(4)(B) is unconstitutional as applied to simple intrastate possession of a visual depiction (or depictions) that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution, or for any economic or commercial use, including the exchange of the prohibited material for other prohibited material.

## I. BACKGROUND

The facts underlying the charge to which McCoy pleaded guilty arise from a single photograph taken in April 2000. The government does not allege that Rhonda McCoy, or her husband Jonathan McCoy, were or are commercial producers of child pornography. At the time charges were filed against the McCoys, the couple had two children: Kala, a ten-year-old daughter, and a twenty-month-old son.[1] The family lived in housing provided by the Navy in San Diego, where Jonathan McCoy served as a Naval Petty Officer.

Sometime in April 2000, Rhonda, Jonathan, and Kala were spending an evening at home, painting Easter eggs and taking family photographs. Rhonda, who, according to the presentence report, has a substance abuse problem as well as mental health problems, had substantial amounts of alcohol that night. At some point during the evening, Rhonda and Kala, partially unclothed, posed side by side for the camera, with their genital areas exposed. This pose was captured in one photograph.

Approximately two months later, Rhonda left five rolls of film with the Navy Fleet Exchange for processing. Shortly thereafter, Rodd Wilson, a loss prevention manager for the Exchange, contacted the U.S. Naval Criminal Investigation Service and informed it of the existence of photographs that appeared to present a child in sexually suggestive poses. Agents of the U.S. Naval Criminal Investigation Service, in conjunction with the FBI and the San Diego Police Department, responded by conducting a search of the McCoy home pursuant to a federal search warrant, and seizing numerous photographs, as well as

---

1. While in federal custody, McCoy gave birth to a third child. Her two older children were placed with foster care parents, and her third child lives with her parents-in-law, although only Kala was alleged to have played any role in the event that led to the arrest of her mother and stepfather.

the family still camera, video camera, and computer.[2]

In January 2001, the government filed an indictment charging both Jonathan and Rhonda with four counts of manufacturing child pornography by a parent using materials transported in interstate commerce, 18 U.S.C. § 2251(b). Rhonda was also charged with one count of manufacturing child pornography using materials transported in interstate commerce, 18 U.S.C. § 2251(a).[3] Rhonda and Jonathan filed motions to dismiss the indictment, which the district court denied on May 10, 2001. Rhonda then entered plea negotiations with the government, while Jonathan elected to stand trial. He was eventually acquitted by a jury on all counts on June 13, 2001. With respect to Rhonda, the government filed a superseding information on May 15, 2001, charging her with one count of possessing child pornography, 18 U.S.C. § 2252(a)(4)(B). The statute provides in relevant part that:

(a) Any person who—

(4) ...

(B) knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or *which was produced using materials which have been mailed or so shipped or transported,* by any means including by computer, if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

(emphasis added). The government does not allege that the photograph of Rhonda and her child was mailed, shipped, or transported in interstate or foreign commerce, nor that Rhonda, hereinafter "McCoy," intended to sell or distribute the photograph in interstate commerce. Rather, federal jurisdiction was premised upon the place of manufacture of the camera and film used to take the pictures. Both were ordinary commercial products. Before McCoy pleaded guilty, it was stipulated 1) that the photograph in question was taken with a Cannon Sureshot 60 view camera and that Kodak film was used; 2) that Kodak film is manufactured in Rochester (New York), Australia, China, Mexico, England, France, Brazil, Indonesia, and India; and 3) that Cannon Sureshot 60 cameras are manufactured in Malaysia. Neither the type of film nor the model of camera is produced anywhere in California.

McCoy filed a motion to dismiss the superseding information on the ground that 18 U.S.C. § 2252(a)(4)(B), on its face and as applied, constitutes an unconstitu-

---

**2.** It is, apparently, not uncommon for photo processing employees to adopt the role of police adjuncts. *See* Ann Zimmerman, *Exposing Crime: Photo Processors Face Developing Dilemma: When to Call Police,* WALL ST. J., June 1, 2001, at A1 (describing criminal charges brought against 65–year–old New Jersey grandmother for taking pictures of grandchildren after bathing); *see also* David Clouston, *Wal–Mart Sued for Calling Police,* Salina J. (Kan.), Dec. 12, 2002, *available* at http://www.saljournal.com/stories/121202

/new_walMart.html (describing lawsuit filed by Kansas mother after Wal Mart photo processors turned over photos of her three-year-old daughter to police, and district attorney declined to file charges).

**3.** Although § 2251 is generally referred to as a "manufacturing" statute, it applies essentially to persons who "persuade[ ]" or "induce[ ]" minors to appear in pictures of the type prohibited or who "use[ ]" or "employ[ ]" them in the production of such pictures or other materials.

tional exercise of Congress's Commerce Clause power.[4] The district court denied the motion.[5] On August 16, 2001, the district court accepted McCoy's conditional guilty plea and sentenced her to 30 months in prison and three years of supervised release.[6]

## II. ANALYSIS

■ The question here is not whether McCoy's conduct in possessing the picture of herself and her ten-year-old daughter may provide the basis for subjecting her to criminal punishment by the state in which the conduct occurred.[7] Rather, the only question before us is whether the federal government may punish McCoy for possessing the picture or, more specifically, whether § 2252(a)(4)(B) is unconstitutional under the Commerce Clause, on its face or as applied. We review questions involving the constitutionality of a statute *de novo. United States v. Serang*, 156 F.3d 910, 913 (9th Cir.1998); *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 637 (9th Cir.1993).

### A. Congressional Power Under the Commerce Clause

The Constitution delegates to Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. As "[c]omprehensive as the word 'among' is, it may be

very properly be restricted to that commerce which concerns more States than one.... The enumeration presupposes something not enumerated; and that something, if we regard the language, or the subject of the sentence, must be the exclusively internal commerce of a State." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194–95 (1824). At issue here is whether a statute enacted pursuant to the Commerce Clause may constitutionally reach non-commercial, non-economic individual conduct that is purely intrastate in nature, when there is no reasonable basis for concluding that the conduct had or was intended to have any significant interstate connection or any substantive effect on interstate commerce.

In reviewing a constitutional challenge to a statute based upon the Commerce Clause, we are guided by two recent decisions of the Supreme Court, *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, (1995) and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). In *Lopez*, the Supreme Court outlined three general categories of activity that may be regulated under the Commerce Clause, the third category encompassing intrastate activities that "substantially affect" interstate commerce. More important for our purposes, in *Morrison*, the Court established a four-part mode of inquiry to be used in determining whether an intrastate activity sub-

---

4. McCoy challenges only the part of § 2252(a)(4)(B) that authorizes a conviction if the visual depictions are made with materials transported in interstate or foreign commerce; she does not challenge the constitutionality of the entire subsection. Thus, when we discuss § 2252(a)(4)(B), we refer only to the clause that prohibits the simple intrastate possession of child pornography that has been made with materials that traveled in interstate commerce.

5. McCoy had also raised a Commerce Clause challenge to the original indictment which the district court had also denied.

6. On May 17, 2002, the district court granted McCoy's motion for bail pending appeal.

7. During her appeal, and before her release on bail, McCoy was transferred to the custody of the state of California on October 12, 2001, after she was charged with state offenses arising from the conduct charged here. The question of the lawfulness of the state proceedings is not before us.

stantially affects commerce and thus falls within the third category. While *Lopez* and *Morrison* together represent a decisive shift in the Court's analysis of the limitations on Congress's power to enact legislation pursuant to the Commerce Clause,[8] it is *Morrison* that is critical to the outcome here: for the question we must consider is whether the challenged portion of the statute regulates intrastate activity that has a substantial effect on interstate commerce, and our answer lies in our application of the four-part inquiry mandated by *Morrison*. First, however, we will describe briefly the two recent cases.

In *Lopez*, the Supreme Court struck down the Gun Free School Zones Act as an unconstitutional exercise of Commerce Clause power by Congress. The Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 514 U.S. at 551, 115 S.Ct. 1624 (1995) (quoting 18 U.S.C. § 922(q)(1)(A)(1988)). After reviewing the structure of its twentieth century Commerce Clause jurisprudence, the Court described three broad categories of activity that Congress may properly regulate under the Commerce Clause: "the channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and "those activities having a substantial relation to interstate commerce, *i.e.* those activities that substantially affect interstate commerce." *Id.* at 558–559, 115 S.Ct. 1624 (internal citations omitted). With respect to the third category, the category implicated here, the Court emphasized that the "proper test

requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559, 115 S.Ct. 1624. Under the *Lopez* framework, the power of Congress to regulate activities in the third category is more limited than its power to regulate the instrumentalities and channels of interstate commerce. The Eleventh Circuit recently explained the consequences of *Lopez* as follows: while Congress may regulate "*any* instrumentality or channel of interstate commerce, the Constitution permits [it] to regulate only those intrastate activities which have a *substantial* effect on interstate commerce, and such regulation of purely intrastate activity reaches the outer limits of Congress' commerce power." *United States v. Ballinger*, 312 F.3d 1264, 1270 (11th Cir. 2002) (holding that federal church arson act did not apply to purely intrastate arson with no substantial effect on interstate commerce).

In reaching the conclusion that possession of a firearm in a school zone does not substantially affect commerce, the *Lopez* Court emphasized three points. First, the statute "ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms.'" 514 U.S. at 561, 115 S.Ct. 1624. Second, the statute contained no "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* Finally, although Congress is not required to make formal findings regarding the effect of an activity on interstate commerce, nothing in the legislative history of the Act supported the finding that the activity in question affect-

---

**8.** Prior to its 1995 *Lopez* decision, the Supreme Court had struck down legislation as an unconstitutional exercise of Commerce Clause power only once since 1936, in *National League of Cities v. Usery*, 426 U.S. 833,

96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). *National League of Cities*, however, was overruled by the Court in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

ed inter-state commerce. *Id.* at 563, 115 S.Ct. 1624.

Five years later, in *Morrison,* the Supreme Court, building on *Lopez,* established what is now the controlling four-factor test for determining whether a regulated activity "substantially affects" interstate commerce. In *Morrison,* the Court held that in enacting 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence under the Violence Against Women Act, Congress exceeded its Commerce Clause power. In doing so, the Court set forth the four determinative considerations: 1) whether the statute in question regulates commerce "or any sort of economic enterprise"; 2) whether the statute contains any "express jurisdictional element which might limit its reach to a discrete set" of cases; 3) whether the statute or its legislative history contains "express congressional findings" that the regulated activity affects interstate commerce; and 4) whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated." 529 U.S. 598, 610–612, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

Applying these factors, the Court concluded that intrastate violence against women does not "substantially affect" inter-state commerce, and thus the enactment of § 13981 was not a constitutional exercise of congressional Commerce Clause power. In so holding, the Court emphasized that it "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly

national and what is truly local." *Id.* at 617–18, 120 S.Ct. 1740.[9] As stated earlier, it is *Morrison* that controls our decision here.

### B. The Application of *Morrison* to § 2252(a)(4)(B)

We apply the four *Morrison* factors in order to decide whether § 2252(a)(4)(B) as applied is a constitutional exercise by Congress of its Commerce Clause power. We do so after re-ordering those factors in the following manner. First, we discuss whether simple intrastate possession of child pornography, without more, is a commercial or economic activity, and then whether the connection between such possession and interstate commerce is attenuated. We begin with these two factors not only because they are related and require a similar analytic approach, but because they are the most important ones. An activity that is utterly lacking in commercial or economic character would likely have too attenuated a relationship to interstate commerce and would, accordingly, not be subject to regulation under the Commerce Clause. Finally, we consider the remaining two factors: the express jurisdictional element of the statute, and whether it poses discrete limitations, and the statute's findings and legislative history. These latter factors aid our analysis but are ordinarily not, in themselves, dispositive.

### 1. Regulation of Commerce or Economic Activity

While not denying the existence of a vast interstate commercial child pornogra-

---

**9.** *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), is the third recent case in which the Supreme Court has delineated the boundaries of the Commerce Clause. There, the Court determined that an owner-occupied residence not used for any commercial purpose did not qualify as property "used in" commerce so as to be reached by the federal arson statute, 18 U.S.C. § 844(i). Because it does not address squarely the "third category" of regulated activity identified in *Lopez,* we do not discuss *Jones* at length here.

phy market, McCoy argues that the simple intrastate possession of a home-produced sexually explicit picture of a child, with no intent to distribute inter-state or by commercial means, is not properly characterized as commercial or economic activity. *Morrison,* 529 U.S. at 610, 120 S.Ct. 1740. The government, relying on *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), argues that "the possession of such matter is the reason interstate trafficking in such obscenity exists," Gov't Br. at 13. It contends that all such pictures are a part of interstate commerce, even if the possessor is a parent who possesses a picture of his own child solely for his own personal use and the picture was locally created (or as the Third Circuit put it "home-grown").[10]

In *Wickard,* Filburn, an Ohio farmer, challenged the constitutionality of the Agricultural Adjustment Act, which imposed penalties on farmers who produced crops beyond given quotas. Filburn argued that Congress had exceeded its Commerce Clause power in passing an act that regulated wheat meant not for commerce (of any kind) but merely for personal use. In rejecting Filburn's challenge, the *Wickard* court explained that:

> One of the primary purposes of the Act in question was to increase the market price of wheat and to that end limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and mar-

ket conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases. *But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce.*

317 U.S. at 128, 63 S.Ct. 82 (emphasis added).

*Wickard's* "aggregation principle" does not determine the question here.[11] In both *Lopez* and *Morrison,* the Supreme Court carefully limited the reach of *Wickard,* while affirming that decision's continued vitality. In *Lopez,* the Court approved of *Wickard's* rationale only in relation to activity the *economic* nature of which was obvious. 514 U.S. at 558, 115 S.Ct. 1624. Similarly, in *Morrison,* the Court affirmed that "in every case where we have sustained federal regulation under the aggregation principle in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the regulated activity was of an apparent commercial character." 529 U.S. at 611 n. 4, 120 S.Ct. 1740. Indeed, the *Morrison* court commented that *Wickard* represented " 'perhaps *the most far reaching example of Commerce Clause authority over intra-state activity,'* " involving " 'economic activity in a way that the possession of a gun in a school zone does not.' " *Id.* at 610, 120 S.Ct. 1740 (quoting

10. *See United States v. Rodia,* 194 F.3d 465, 477 (3d Cir.1999) (assessing the effect of "home-grown" pornography upon interstate commerce).

11. The dissent finds a false analogy between the relationship between intrastate conduct and interstate commerce in *Wickard* and the purported one in McCoy's circumstances. Roscoe Filburn's home-grown wheat may not

have been meant for sale, but its very existence had an economic effect. *Wickard,* 317 U.S. at 128, 63 S.Ct. 82("It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions."). McCoy's photo does not have any plausible economic impact on the child pornography industry.

*Lopez*, 514 U.S. at 560, 115 S.Ct. 1624) (emphasis added).

In light of these deliberately limiting statements by the Supreme Court, the Third Circuit's conclusion in *United States v. Rodia*, 194 F.3d 465 (3d Cir.1999), *a case predating Morrison*, that § 2252(a)(4)(B) can be upheld under *Wickard* is no longer sustainable. Despite its acknowledged misgivings about *Wickard*, the *Rodia* court applied that case's "generic principle" to find that wholly intrastate possession of child pornography is an activity "substantially affecting commerce." Expanding the aggregation principle of *Wickard* beyond all prior bounds, the *Rodia* court posited the theory that Congress *could have* concluded (that is, that Congress could have made findings but didn't) that "purely intrastate possession" will some day likely lead to greater activity on the part of the possessor. In support of its theory it then proposed what it called the "notion of addiction": "[T]he possession of 'home grown' pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography." 194 F.3d at 477–78.[12]

The Third Circuit's conclusions, as well as its "addiction" theory, rest on highly questionable premises.[13] First, and most important, its "common sense understanding of the demand side forces" of child pornography, 194 F.3d at 478, is based on speculation that Congress *could have* reasoned that purely intrastate possession will ultimately have a substantial effect on interstate commerce, even though it chose not to make any such findings or declarations. Hypothetical reasons should be used with great circumspection, for they can easily create justifications that Congress may not have intended. *See United States v. Fisher*, 6 U.S. (2 Cranch) 358, 385, 386 (1805) ("Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived."). We should be particularly hesitant to engage in such creative speculation where congressional intent cannot create federal jurisdiction, *Morrison*, 529 U.S. at 614, 120 S.Ct. 1740, and where the Constitution requires a sharp distinction between national and local affairs, especially with respect to criminal matters. *Id.* at 617–18, 120 S.Ct. 1740. Second, the *Rodia* court's reliance on subsequent legislative history[14] to bolster its addiction theory is, as the Supreme Court has suggested, a " 'hazardous basis for inferring the intent of an earlier' Congress." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960)).[15]

**12.** Ultimately, the dissent's disagreement with our analysis can be reduced to a single issue: whether or not *Rodia's* addiction theory-tying non-economic and non-commercial intrastate possession to interstate commerce by means of a psychological theory grounded in a passing mention by an advocacy group—is compelling. *See infra* n.16. For the reasons we have explained, we find that addiction theory not only rhetorically unpersuasive but premised upon a legal analysis that can no longer be sustained after *Morrison*.

**13.** In *United States v. Angle*, 234 F.3d 326 (7th Cir.2000), the Seventh Circuit upheld § 2252(a)(4)(B) "via a market theory." This market theory is essentially the same expansion of *Wickard* adopted by the Third Circuit

in its pre-*Morrison* decision in *Rodia;* indeed, *Angle* quotes that decision's "addiction" theory. 234 F.3d at 337. Without any analysis, the *Angle* court then summarily distinguishes *Morrison* in a footnote. *Id.* at 338 n. 13.

**14.** Despite the fact that the provision at issue in this case was part of the Child Protection Restoration and Penalties Act of 1990, Pub.L. No. 101–647, Title III, § 323(a), 104 Stat. 4789 (1990), the *Rodia* court cited as legislative history findings from 1996 amendments to the Act. 194 F.3d at 469, 478.

**15.** While the Child Pornography Prevention Act of 1996, P.L. 104–208 §§ 210(4),(5), 110 Stat. 3009–26 (1996), did increase the penalty

Third, the Third Circuit's labeling of persons who possess a "home-grown" picture of a child as "child pornographers" and addicts-in-futuro is to pile presumption on presumption, or in the words of *Lopez*, "inference upon inference." 514 U.S. at 567, 115 S.Ct. 1624. We see no more justification for assuming that a possessor of a "home-grown" photograph of one's own child will ultimately enter the interstate pornography market as an addict than there is to assume that the possessor of a single marijuana cigarette will inevitably turn into a full-time heroin junkie.[16] As a final matter, we note that *Rodia* implicitly assumes that child pornography, like Filburn's wheat, is fungible, an essential element of the *Wickard* decision. We disagree. McCoy possessed a family photo (pornographic as it may have been) meant entirely for personal use, without having any intention of exchanging it for other items of child pornography, or using it for any other economic or commercial reasons. Nor is there any reason to believe that she had any interest in acquiring pornographic depictions of other children. There is thus no fungibility element present in cases such as hers.

We determine for other reasons as well that Filburn's wheat provides a poor analogy to McCoy's photo. Here, McCoy's photograph is much farther removed from interstate activity than Filburn's wheat. Filburn's "[h]ome-grown wheat ... compete[d] with wheat in commerce," 317 U.S. at 128, 63 S.Ct. 82, and reduced the *de-*

*mand* for the wheat grown for commercial sales, in direct contravention of the purposes of the Agricultural Adjustment Act—to reduce the *supply* and, accordingly, to bolster the price. McCoy's venture, in contrast, was purely non-economic and non-commercial, and had no connection with or effect on any national or international commercial child pornography market, substantial or otherwise. The picture of McCoy and her daughter which McCoy possessed for her own personal use did not "compete" with other depictions exchanged, bought, or sold in the illicit market for child pornography and did not affect their availability or price. Nor are pictures of the type McCoy possessed connected in any respect with commercial or economic enterprises. Section 2252(a)(4)(B) is, thus, not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624.

In reviewing its Commerce Clause jurisprudence, the Supreme Court stated that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Morrison*, 529 U.S. at 613, 120 S.Ct. 1740; *see also Ballinger*, 312 F.3d at 1270 ("No such aggregation of local effects is constitutionally permissible in reviewing congressional regulation of intra-state, *non-economic* activity.").[17] Here, we conclude that simple in-

---

portions of §§ 2251 and 2252, it did not alter the offense conduct at issue here.

**16.** We offer this observation respectfully, noting that the Third Circuit in support of its "addiction" theory relies principally on a statement made before a Senate Committee by a Mrs. Dee Jepsen some six years after the passage of the bill that enacted the substantive provisions of § 2252(a)(4)(B). The Senate Committee Report quotes Mrs. Jepsen, the President of Enough is Enough, a group that

lobbies for legislation against child pornography, as saying that child pornography is "an addiction." S. REP. No. 104–358 (1996), *reprinted at* 1996 WL 506545 at *13 (quoted in *Rodia*, 194 F.3d at 478).

**17.** The dissent's quotation of *Ballinger* fails to counter its, and our, central premise. *Wickard's* theory of aggregate impact, cited by the Eleventh Circuit, applies *only* when "the regulated intrastate activity is a commercial or economic one." 312 F.3d at 1270. The *Bal-*

trastate possession of home-grown child pornography not intended for distribution or exchange is "not, in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613, 120 S.Ct. 1740; *see also United States v. Kallestad*, 236 F.3d 225, 232(5th Cir.2000) (Jolly, J., dissenting) ("[S]imple possession of child pornography does not interact with interstate commerce like the possession and consumption of wheat did in *Wickard*.").[18]

### 2. Attenuated Effect

McCoy argues that the connection between the simple intrastate possession of child pornography and interstate commerce is too attenuated to warrant a valid exercise of Commerce Clause power. *Morrison*, 529 U.S. at 612, 120 S.Ct. 1740. In response, the government, citing the Fifth Circuit's decision in *Kallestad*, argues that Congress can reach purely intrastate conduct if it rationally determines that doing so is necessary to effectively regulate the national market. 236 F.3d at 230. Essentially, the government asserts that "such possession is 'never wholly local'" *Kallestad*, 236 F.3d at 233 (Jolly, J., dissenting).

Reasoning similar to the government's has been rejected by the Supreme Court twice recently, in both of the Commerce Clause cases we discussed earlier. In *Lopez*, the government argued that the presence of guns at schools threatened the educational process, which in turn threatened to produce a less productive workforce, which in turn would negatively affect interstate commerce. In rejecting what it called the "costs of crime" approach, the *Lopez* Court warned, that "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." 514 U.S. at 564, 115 S.Ct. 1624. The Court said that to conclude otherwise would require it to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567, 115 S.Ct. 1624. In *Morrison*, petitioners relied upon legislative history linking gender-motivated violence to national effects on productivity, medical costs, and the demand for interstate products. The Supreme Court rejected this "but-for" analysis, and concluded that accepting such findings would eliminate any barriers to federal power: "Petitioner's reasoning ... will not limit Congress to regulating violence but may ... be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect

---

*linger* court ultimately, of course, held that the federal church arson statute, 18 U.S.C. § 247(a)(1), could not apply to the defendant's intrastate church arson because any putative interstate commercial connections were "too insubstantial to satisfy the jurisdictional element of § 247." *Id.* at 1276.

**18.** Finally, we note also the important difference between conduct having an effect on *interstate* commerce and conduct that multiple states have had to address as internal matters. As the Fifth Circuit noted in *United States v. Bird*, 124 F.3d 667, 678 n. 13 (5th Cir.1997):

[S]imply because a type of antisocial conduct (which any state could validly pro-

scribe) can fairly be described as a 'national' problem in the sense that many (or even all) states experience more instances of it than are desirable or desired,[does not mean that] this of itself suffices to bring such conduct within the scope of Congress's Commerce Clause power. Plainly it does not. Ever since a time well before the Constitutional Convention, there have been every year in each of the several states more murders than desirable or desired, but it is nevertheless plain that the Commerce Clause does not authorize Congress to enact legislation punishing any and all murders throughout the nation.

of marriage, divorce, and childrearing on the national economy is undoubtedly significant." 529 U.S. at 615–16, 120 S.Ct. 1740. In *Ballinger,* the Eleventh Circuit concluded that the federal church—arson statute, 18 U.S.C. § 247(a)(1), could only be applied to an arson that itself had substantially affected interstate commerce. Holding that the statute could not be applied to the appellant's conduct, the *Ballinger* court said that to suggest that the accumulation of a series of individual minimal effects on interstate commerce would suffice to apply the statute would obliterate any distinction between federal and state powers: "To allow Congress to regulate local crime on a theory of its aggregate effect on the national economy would give Congress a free hand to regulate any activity, since, in the modern world, virtually all crimes have at least some attenuated impact on the national economy." 312 F.3d at 1271(citing *Morrison,* 529 U.S. at 615, 120 S.Ct. 1740).

■ It is particularly important that in the field of criminal law enforcement, where state power is preeminent, national authority be limited to those areas in which interstate commerce is truly affected. *cf. Lopez,* 514 U.S. at 561 n. 3, 115 S.Ct. 1624 ("When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'") (quoting *United States v. Enmons,* 410 U.S. 396, 411–12, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)). The police power is, essentially, reserved to the states, *Morrison,* 529 U.S. at 618, 120 S.Ct. 1740("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). That principle must guide our review of Congress's exercise of its Commerce Clause power in the criminal law area.

In sum, the application of § 2252(a)(4)(B) to McCoy in the circumstances present here (or to others in similar circumstances) does not regulate economic or commercial activity; nor does it show a relationship, attenuated or otherwise, between the regulated activity and interstate commerce—and certainly not the type of direct or substantial relationship necessary to justify the invocation by Congress of its Commerce power in order to regulate intrastate criminal activity. We turn to the remaining *Morrison* factors.

*3. Express Jurisdictional Element*

Unlike the statutes at issue in *Lopez* and in *Morrison,* § 2252(a)(4)(B) contains an express jurisdictional element that is intended to satisfy Commerce Clause concerns. Courts have referred to such statutory attempts to comply with the Commerce Clause as "jurisdictional hooks": a "provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." *Rodia,* 194 F.3d at 471. The purpose of a jurisdictional hook is to limit the reach of a particular statute to a discrete set of cases that substantially affect interstate commerce. *Morrison,* 529 U.S. at 611–12, 120 S.Ct. 1740 (citing *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624). The language of the jurisdictional hook in question here fails totally to achieve that purpose. It not only fails to limit the reach of the statute to any category or categories of cases that have a particular effect on interstate commerce, but, to the contrary, it encompasses virtually *every* case imaginable, so long as any modern-day photographic equipment or material has been used. Specifically, in cases involving prosecutions under § 2252(a)(4)(B), the government has asserted that the statutory element purportedly satisfying "interstate commerce"

concerns has been met by defendants' possession of papers, film, and cameras that have been made, as such materials or equipment virtually always are, in states (and countries) other than the one in which an individual defendant is prosecuted.[19] *See United States v. Lacy,* 119 F.3d 742 (9th Cir.1997) (computer manufactured out of state); *United States v. Bausch,* 140 F.3d 739 (8th Cir.1998) (camera manufactured in Japan); *United States v. Robinson,* 137 F.3d 652 (1st Cir. 1998) (Kodak film manufactured outside of state); *Rodia,* 194 F.3d 465 (Polaroid film manufactured outside of New Jersey); *Kallestad,* 236 F.3d 225 (film manufactured outside of Texas); *United States v. Galo,* 239 F.3d 572 (3d Cir.2001) (camera, film, and photographic paper made outside of Pennsylvania); *United States v. Corp,* 236 F.3d 325 (6th Cir.2001) (photographic paper made in Germany).

The statute's "jurisdictional hook" had been viewed by some courts in decisions predating *Morrison* as sufficient to render the statute constitutional.[20] The Supreme Court's decisions in *Lopez* and *Morrison* however, reject the view that a jurisdictional element, standing alone, serves to shield a statute from constitutional infirmities under the Commerce Clause. At most, the Court has noted that such an element *"may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce," or that it may "lend support" to this conclusion. *Morrison,* 529 U.S. at 612, 613, 120 S.Ct. 1740 (emphasis

added). Thus, the "jurisdictional element" must be considered along with the other factors listed in *Morrison.*

We agree with the Third and Seventh Circuits, which have expressed substantial doubt that the "jurisdictional hook" in § 2252(a)(4)(B) adds any substance to the Commerce Clause analysis. *Rodia,* 194 F.3d at 472–473; *United States v. Angle,* 234 F.3d 326, 337 (7th Cir.2000); *cf. United States v. Pappadopoulos,* 64 F.3d 522, 525–528 (9th Cir.1995) (holding receipt of gas interstate into home insufficient as jurisdictional element under Commerce Clause to sustain federal arson conviction). As the *Rodia* court noted even before *Morrison,* hardly anyone could create the visual depictions contemplated in the statute *without* using modern photographic and computer equipment that, at some point, had been transported across state or national borders:

> As a practical matter, the limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute. At all events, it is at least doubtful in this case that the jurisdictional element adequately performs the function of guaranteeing that the final product regulated substantially affects interstate commerce.

194 F.3d at 473. The Sixth Circuit echoed the Third Circuit's concerns. It stated:

---

**19.** See discussion in section I, *supra,* noting the stipulation between the parties that the Kodak film used is manufactured in Rochester (New York), Australia, China, Mexico, England, France, Brazil, Indonesia, and India, and that the Cannon Sureshot 60 camera used is manufactured in Malaysia.

**20.** *See Bausch,* 140 F.3d at 741(stating that "the statute ensures, through a case-by-case inquiry, that each defendant's pornography possession affected interstate commerce");

*Robinson,* 137 F.3d at 656(stating that jurisdictional element "requires an answer on a case-by-case basis"); *United States v. Hampton,* 260 F.3d 832, 834–35 (8th Cir.2001) (following *Bausch's* rationale); *United States v. Hoggard,* 254 F.3d 744, 746 (8th Cir.2001) (same); *see also United States v. Winningham,* 953 F.Supp. 1068, 1074 (D.Minn.1996) (finding that jurisdictional element refutes constitutional challenge under *Lopez's* second category of regulating "instrumentalities of commerce").

The statute facially has an extremely wide sweep. Although commentators have generally spoken in terms of film or computers, the statutory terms have no such limitation. A painter using a model who was just under 18, even if it was his wife, would fall afoul of the statute if the paints, brushes, or canvas had traveled in interstate commerce, even long before enactment of the act.

*Corp*, 236 F.3d at 331.

In McCoy's case, the "jurisdictional hook" is the use of a camera and film, made somewhere outside of California. Such use does not, in our view, allow the application of § 2252(a)(4)(B) to local or home-grown pornography not otherwise a part of interstate commerce to pass constitutional muster.[21] In fact, we agree with the Third Circuit that the "limiting" jurisdictional provision is for all practical purposes "useless." It completely fails to "guarantee[ ] that the final product regulated substantially affects interstate commerce." 194 F.3d at 472. Moreover, as the *Rodia* court noted, " 'virtually all criminal actions in the United States involve the use of some object that has passed through interstate commerce.' " *Id.* at 473(quoting Andrew St. Laurent, *Reconstituting United States v. Lopez: Another Look at Federal Criminal Law*, 31 Colum. J.L. & Soc. Probs. 61, 112 (1998)). As that court also pointed out, a "hard and fast rule" upholding a statute's constitutionality under the Commerce Clause whenever a jurisdictional element was present would "ignore[ ] the fact that the connection between the activity regulated and the jurisdictional hook may be so attenuated" that there may be no substantial effect on interstate commerce. 194 F.3d at 472. Finally, unlike in some of the earlier cases, the Government agrees here that the statute's jurisdictional hook does not in itself establish the requisite basis for the invocation of Congress's Commerce Clause authority. Gov't Br. at 17. We would go farther, however. We conclude that the hook at issue here provides no support for the government's assertion of federal jurisdiction.

### 4. Legislative History

■ While neither necessary nor conclusive, congressional findings addressing

---

21. We note that virtually identical language appears in §§ 2251(a) and (b). See *supra* n. 3. Those provisions read:

ANY person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in inter-state or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished as provided under subsection (d), if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, *if that visual depiction was produced using materials that have been mailed, shipped, or transported in inter-state or foreign commerce* by any means, including by computer, or if such visual depiction has actually been transported in inter-state or foreign commerce or mailed.

18 U.S.C. § 2251(a) (emphasis added);

Any parent, legal guardian or person having custody or control of a minor who knowingly permits such minor to engage in, or to assist any other person to engage in, sexually explicit conduct for the purpose of producing any visual depiction of such conduct shall be punished as provided under subsection (d) of this section, if such parent, legal guardian, or person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, *if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce* by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

18 U.S.C. § 2251(b) (emphasis added).

the national impact of the regulated activity in question can assist in determining whether that activity substantially affects interstate commerce. *Lopez,* 514 U.S. at 563, 115 S.Ct. 1624. As the Supreme Court noted in *Morrison,* however, it is not the mere *existence* of legislative findings that is determinative. 529 U.S. at 614, 120 S.Ct. 1740. Rather, "[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question." *Id.* (quoting *Lopez,* 514 U.S. at 557 n. 2, 115 S.Ct. 1624). In *Morrison,* although Congress made explicit findings with respect to the national effects of gender-motivated violence, the Supreme Court found the congressional rationale doubtful, on the ground that Congress failed to distinguish between "national and local authority." *Id.* at 615, 120 S.Ct. 1740. The Court thus rejected the Congressional findings. *Id.*

Here, the government argues that legislative history supports its position that purely intrastate possession is part of interstate commerce. On our reading of this history, we find, if anything, support for the opposite conclusion—that § 2252(a)(4)(B), as applied to McCoy and others similarly situated, would be unconstitutional. First, it is true that Congress declared *commercial* child pornography to be a national problem. *See* S. Rep. No. 95–438, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 40, 42–43; *see also* Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–26 (1996). These determinations, however, speak only to the general phenomenon of commercial child pornography; they do not speak to the relationship between *intrastate non-commercial* conduct like McCoy's and the interstate commercial child pornography market. For example, the 1978 Senate report observes only generally that "child pornography and child prostitution have become highly organized, multimillion dollar *industries* that operate on a nationwide scale." S. Rep. No. 95–438, at 5 (1978), *reprinted in* 1978 U.S.C.C.A.N. 40, 42–43 (emphasis added). By contrast, we note that in *Morrison,* there existed specific legislative findings describing the effect of intrastate conduct on interstate commerce, despite which the Supreme Court ultimately determined that intrastate gender-motivated violence did *not* substantially affect inter-state commerce. 529 U.S. at 615, 120 S.Ct. 1740(*quoting* H.R. Rep. No. 103–711, at 385 (1994), 1994 U.S.C.C.A.N. 1803, 1853). At most, the legislative history here tells us that Congress intended to eliminate the interstate commercial child pornography market, and nothing more.[22]

**22.** Moreover, we are puzzled by the government's attribution of the view expressed in the Meese Report to Congress. *See* Gov't Br. at 19 (citing U.S. Dep't of Justice, *Attorney General's Commission on Pornography: Final Report* (1986) ("Meese Report")). The Attorney General's Commission on Pornography operated pursuant to the provisions of the Federal Advisory Committee Act, Pub.L. No. 92–463, 86 Stat. 770 (1972), as amended by the Government in the Sunshine Act, Pub.L. No. 94–409, S 5(c), 90 Stat. 1241, 1247 (1976). It represented at most the view of the Executive Branch.

Even if we were to assume that Congress relied on the Meese Report in deliberating upon § 2252(a)(4)(B), the findings and recommendations of that Report would not especially support the Government's position. Specifically, the Report cautioned that the concern for child victims of sexual exploitation should not obscure the regard for the proper role of federal law in criminal law enforcement:

The federal interest in protecting children, of course, is secondary to that of the states, which act as principal guardians against the abuse or neglect of the young.... States are not limited, as is the

Second, doubt existed from the outset regarding Congress's authority to regulate intrastate activity. When sections 2251, 2252, and 2253 were first enacted in the Protection of Children Against Sexual Exploitation Act of 1977, Pub.L. No. 95–225, 92 Stat. 7. (1978), the Department of Justice expressed concern that the proposed bill could be construed to permit convictions where only the materials used to produce the prohibited pictures had been transported in interstate commerce and, thus, where the conduct was purely intrastate. Writing on behalf of the Department, then Assistant Attorney General Patricia M. Wald stated that:

> [T]he bill would cover a purely intrastate photographing and distribution operation on the theory that commerce is 'affected' in that the processing of the film or photographs utilize materials that moved in interstate commerce.... In our opinion, the investigation or prosecution of *purely local acts of child abuse should be left to local authorities with federal involvement confined to those instances in which the mails or facilities of interstate commerce are ac-*

*tually used or intended to be used for distribution of the film or photographs in question.*

S. REP. No. 95–438, at 25–26, *reprinted in* 1978 U.S.C.C.A.N. 40, 61–62 (emphasis added).[23] The Department recommended that the bill cover only conduct in which the prohibited pictures themselves had been moved in interstate or foreign commerce: "We recommend that the bill be limited to situations in which a person knows, has reason to know or intends that the act in question will be photographed and mailed or shipped in interstate or foreign commerce." *Id.* The jurisdictional problem recognized by the Department of Justice some twenty-five years ago is only exacerbated by the Supreme Court's recent adoption of an even more restrictive view of the scope of Congress's Commerce Clause power, in *Lopez* and *Morrison.*[24]

We do not find any conflict between our decision today and our decision in *United States v. Cortes,* 299 F.3d 1030(9th Cir. 2002), which rejected a Commerce Clause challenge to the federal "carjacking statute," 18 U.S.C. § 2119. Cortes argued

---

federal government, to regulation of child pornography in or affecting interstate commerce; they have the power to prohibit *all* production and trafficking in such materials.

*Meese Report* at 607 (emphasis in original).

**23.** *See also* Task Force on the Federalization of Criminal Law (American Bar Association Criminal Justice Section), *The Federalization of Criminal Law* 48 (1998).

> There is ... a highly debatable issue as to what conduct should be targeted for federal prosecution in the interstate commerce category .... The response to citizen concern can produce a contrived or tenuous interstate basis that is not really distinctly federal in nature. Such responses can intrude into areas of traditional state control and be counterproductive, producing a federal crime not likely to have any demonstrable impact and one which will risk detrimental consequences.

**24.** We note that the Government does not rely by analogy on cases involving the federal Controlled Substances Act, for good reason. That Act contains express legislative findings regarding the relationship between purely intrastate activities and interstate commerce. It states, among other things, that "[l]ocal distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances," and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. §§ 801(4) & (6). It is primarily on the basis of these congressional findings that we rejected Commerce Clause challenges to the Act. *See, e.g., United States v. Tisor,* 96 F.3d 370, 373–375 (9th Cir.1996); *United States v. Kim,* 94 F.3d 1247, 1250 (9th Cir.1996); *United States v. Visman,* 919 F.2d 1390, 1392–93 (9th Cir.1990) (citing *Wickard* ). We express no view, however, as to the effect of *Morrison* on these cases.

that because the carjacking incident of which he had been convicted occurred entirely intrastate, it had no substantial effect on interstate commerce. In rejecting appellant's argument, we relied upon congressional findings that specifically discussed the national black market in stolen car parts. 299 F.3d at 1035. Cars stolen intrastate (and car thefts are almost always intrastate) are disassembled in professional "chop shops" where the parts are then sold in interstate and international commerce. *Id.* Thus, a direct link exists between the intrastate theft and the interstate sale. While a single case might appear to have a *de minimis* effect on interstate commerce, we held that carjacking as a "class of activity" substantially affects interstate commerce so as to justify the statute under the Commerce Clause. *Id.* at 1036–37. By contrast, *no* legislative findings exist with respect to the interstate effect of intrastate, non-commercial possession of the prohibited materials here, and we decline to "pile inference upon inference," *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624, to create a connection between that purely local activity—the simple possession of "home-grown" child pornography—and the interstate commercial activity in question—the "multi-million dollar [pornography] industries" that Congress determined "operate on a national scale."

Significantly, in *Cortes,* the "jurisdictional hook" in the statute and the item which affects interstate commerce are one and the same. The automobile, if anything, is the paradigm of modern interstate commercial activity in the United States. Moreover, federal criminal laws regarding automobiles may be justified under the Commerce Clause *either* because the activity in question "substantially affects" interstate commerce *or* because "cars are themselves instrumentalities of commerce, which Congress may protect." *United States v. Oliver,* 60 F.3d 547, 550 (9th Cir.1995); *see also Pappadopoulos,* 64 F.3d at 527("[M]otor vehicles themselves constitute an important instrument of commerce, and our highways, which are directly affected by carjacking violence, constitute perhaps our most vital channel or artery of interstate commerce.").[25] We find no conflict between our decision here and that reached in *Cortes.*

5. *Summary*

Having reviewed the four *Morrison* factors, we conclude that under the first, and ordinarily the most important, factor: when applied in the circumstances before us, § 2252(a)(4)(B) does not regulate activity that is economic or commercial in nature. The remaining *Morrison* factors also support our conclusion that simple intrastate possession of child pornography does not fall within *Lopez's* third category of permissible Commerce Clause regulation: activity that "substantially affects" interstate commerce. The relationship between purely intrastate non-commercial possession of prohibited home-grown depictions and the highly commercial interstate activity engaged in by the "multi-million dollar industries" involved is highly attenuated at best. In this regard, we find no basis or support for the Third Circuit's pre-*Morrison* addiction theory. To the contrary, the assumption that individuals who possess "home-grown" pictures for their own personal use will as a result become commercial pornographers or pornography addicts appears to us to stretch unfounded supposition too far. Such uninformed speculation runs afoul of the

---

**25.** The government does not argue that § 2252(4)(B) can be upheld as constitutional under the Commerce Clause as a regulation of the "channels" of interstate commerce or of the "instrumentalities" of interstate commerce: the first two categories identified in *Lopez.*

warnings in *Lopez* and *Morrison* about piling "inference upon inference" in order to justify the exercise of federal power in an area expressly reserved to the states. Similarly, the jurisdictional hook of § 2252(a)(4)(B) does not serve to limit application of the statute to a discrete set of cases that have a substantial effect on interstate commerce. Finally, the findings in the statute and the legislative history do not support the conclusion that purely intrastate "home-grown" possession has a substantial connection to interstate trafficking in commercial child pornography.

### C. Other Circuits

In defending the constitutionality of § 2252(a)(4)(B), the government relies on decisions of other circuits that have held that Congress did not exceed its Commerce Clause power in enacting the statute. A number of these decisions, which involve facial challenges to the statute, do not apply the current law that controls Commerce Clause analysis because they were decided before *Morrison* and are therefore of limited assistance here.[26] Other decisions considering Commerce

Clause challenges to § 2252(a)(4)(B) that were decided after *Morrison* either declined to apply its framework or failed to mention the case at all.[27]

The Fifth Circuit, in *Kallestad*, 236 F.3d 225, is thus far the only circuit to have upheld the statute after purporting to apply the four-part test set forth in *Morrison*.[28] In rejecting a facial constitutional challenge to the provision at issue here, the *Kallestad* majority relied heavily on *Wickard*, and expanded *Wickard's* scope; in doing so, it gave insufficient weight to the *Morrison* factors themselves. The dissent, in contrast, relied principally on the *Morrison* factors as well as on *Morrison's* statements regarding the limited circumstances in which *Wickard* applies.

In applying the first and fourth factors of *Morrison*, discussed *supra*, the *Kallestad* majority assumed that the problems with respect to the wheat market of the 1940s were directly analogous to the problems of child pornography today. Thus, in deciding whether conduct of the type in question here is commercial in character, the *Kallestad* majority noted: "*Wickard* affirms that, when a person produces for

---

**26.** *See Rodia,* 194 F.3d at 476–79; *Robinson,* 137 F.3d at 656; *Bausch,* 140 F.3d at 741. Further, as we explained in part II.B.3, *supra, Robinson* and *Bausch* erroneously place exclusive reliance on the dubious jurisdictional hook set forth in § 2252(a)(4)(B), while *Rodia* relies on precedent the application of which the Supreme Court has severely limited in *Morrison*. In addition, as we have explained in the text, we respectfully disagree with significant aspects of *Rodia's* rationale.

We have previously addressed § 2252(a)(4)(B), but did not then consider its constitutionality. *Lacy,* 119 F.3d at 750. In *Lacy,* cited by the district court, the only relevant issue was whether pictures downloaded from the Internet had been "produced" within the meaning of § 2252(a)(4)(B). Lacy contended that in downloading the visual depictions, he was merely reproducing images rather than "producing" them. We resolved that non-consti-

tutional issue by holding that, under § 2252(a)(4)(B), it did not matter whether the depictions were copies rather than originals. *Id.* at 745.

**27.** *See Galo,* 239 F.3d 572 (rejecting facial and as applied challenges without mentioning *Morrison*); *Hampton,* 260 F.3d 832 (rejecting facial challenge and citing but not discussing *Morrison*); *Hoggard,* 254 F.3d 744 (rejecting facial challenge and after mentioning *Morrison* briefly, concluding it is bound by pre-*Morrison* circuit precedent); *Angle,* 234 F.3d 326 (rejecting facial challenge and distinguishing *Morrison* in footnote).

**28.** The Sixth Circuit cited *Morrison's* four-part test in *Corp,* 236 F.3d at 329, but declined to apply it to Corp's facial challenge. Instead, as discussed *infra* part II.D, the *Corp* court held that § 2252(a)(4)(B) was unconstitutional as applied to Corp.

their [sic] own consumption a product that is traded in an interstate market, his conduct is economic in character. Kallestad may not have intended to sell his photographs, but then Filburn never intended to sell his wheat." 236 F.3d at 228. Similarly, in deciding that the relationship of the local activity at issue to interstate commerce was not attenuated, the *Kallestad* majority, implicitly referring to *Wickard's* principle, stated:

A true market is inevitably commercial, and is pushed by supply and demand, whether manifested in swaps or purchase and sale.... With such a market we have little hesitation in concluding that *where the product is fungible,* such that it is difficult if not impossible to trace, Congress can prohibit local possession in an effort to regulate product supply and demand and thereby halt interstate trade.

*Id.* at 231 (emphasis added).

For reasons we have discussed in parts II.B.1 and 2, *supra,* we conclude that simple intrastate possession is not, by itself, either commercial or economic in nature, that a "home-grown" picture of a child taken and maintained for personal use is not a fungible product, and that there is no economic connection—supply and demand or otherwise—between possession of such a picture and the national multi-million dollar commercial pornography industry. Thus, in McCoy's circumstances and those of others similarly situated, the possession of one or more photographs does not constitute a case in which "failing to reach the fountainheads will impede [the] regulation of the interstate stream." 236 F.3d at 230. In his dissent in *Kallestad,* Judge Jolly aptly stated:

Today, the majority has embraced logic the *Morrison* Court eschewed. The majority holds that Congress can indeed regulate non-economic, intrastate criminal conduct (possession of child pornography), simply because 'this reach into local intrastate conduct was a necessary incident of a congressional effort to regulate a national market.... The majority undertakes [ ]an application of *Wickard,* even though *Morrison* explicitly reminds us that 'in every case where we have sustained federal regulation under *Wickard's* aggregation principle, the regulated activity was of an apparent commercial character.'

*Id.* at 232 (*quoting* 529 U.S. at 611 n. 4, 120 S.Ct. 1740). Full consideration of *Morrison* compels the conclusion that in *Kallestad* the dissent, rather than the majority, properly applied the four controlling *Morrison* factors.

### D. The Statute As Applied

Nothing in current Commerce Clause jurisprudence, as proclaimed by the Supreme Court, provides support for the application of § 2252(a)(4)(B) to McCoy and others similarly situated, whose non-commercial, non-economic possession of a prohibited photograph is entirely intrastate in nature. McCoy's circumstances are similar to those held by the Sixth Circuit in *Corp,* 236 F.3d 325, to constitute grounds for a successful *as-applied* Commerce Clause challenge to the application of the statute. In *Corp,* the defendant was charged with possession of child pornography, namely, photographs taken of a seventeen-year-old girl engaged in sexual activity with his twenty-six-year-old wife. In that case, as in the case before us, offended photo shop employees tipped off the police. The only explicit link between the defendant's conduct and interstate commerce was the Agfa photographic paper, used to print the photos: the paper was manufactured outside of the state in which the photos were taken, developed, and processed. In finding that the statute as applied to Corp could not be justified under the Commerce Clause, the court based

its decision principally on the fact that there was only an attenuated connection between the defendant's behavior and inter-state commerce:

> [W]e conclude that Corp's activity was not of a type demonstrated *substantially* to be connected or related to interstate commerce on the facts of this case. Under the undisputed circumstances here, Corp was not involved, nor intended to be involved, in the distribution or sharing with others of the pictures in question.... Clearly, Corp was not the typical offender feared by Congress that would become addicted to pornography and perpetuate the industry via interstate connections.

236 F.3d at 332–33.

Likewise, nothing in the circumstances of McCoy's case establishes any substantial connection between her conduct and *any* interstate commercial activity. While McCoy may have shown poor judgment as a parent, and likely requires substance abuse rehabilitation, no one claims that she is or is likely to become a child pornographer.[29] The kind of demonstrable and substantial relationship required between intrastate activity and interstate commerce is utterly lacking here.

Furthermore, McCoy's factual circumstances, in which she possessed a family photo for her own personal use, with no intention to distribute it in interstate or foreign commerce, do not pose a law enforcement problem of interstate commercial child pornography trafficking. While it is true that child pornography "does not customarily bear a label identifying the state in which it was produced," *Kallestad*, 236 F.3d at 230, such problems of identification are not present in this case. As we

have emphasized, McCoy's "home-grown" photograph *never entered in and was never intended for interstate or foreign commerce.* Nor, as we have already stated, are we faced with the question of the ability of a state to prosecute McCoy for her conduct. We have before us solely a question of federal jurisdiction, under the Commerce Clause. We hold that such jurisdiction is lacking here.

■ The dissent criticizes our decision as unwittingly or deliberately holding the statutory provision unconstitutional on its face rather than as applied. Our respected colleague is simply wrong. We express no view of the constitutional application of § 2252(a)(4)(B) to wholly intrastate possession of a commercial or economic character. As we have repeated through-out our discussion, no one disputes that McCoy's possession was non-economic and non-commercial, and our analysis applies to her and to others similarly situated. Nor is this case decided on the idiosyncratic facts of an individual instance of *de minimis* character. *Lopez,* 514 U.S. at 558 115 S.Ct. 1624. The cases cited by the dissent involve singular and trivial instances of conduct at the outer edges of a particular statute's reach; that is not the case here. We interpret the statute as applied to McCoy's conduct as it falls within a *class of activity* that § 2252(a)(4)(B) purports to reach: intrastate possession of a non-commercial and non-economic character. This class of activity represents a substantial portion of the conduct covered by § 2252(a)(4)(B). In fact, it was in an attempt to bring such conduct within its constitutional authority that Congress included the jurisdictional hook that would

---

**29.** The district court, at McCoy's sentencing hearing, appeared to acknowledge as much: While the photo meets the definition of sexually explicit conduct, and certainly can't be excused, one I think would be hard-

pressed to classify the photo as within, I believe the heartland of photos collected or produced by terribly diabolical persons to gratify prurient interests in the sexuality of young children.

result in all photographs, and nearly any conceivable visual depiction, *Corp,* 236 F.3d at 331, being treated as having been manufactured in interstate commerce. It is this hook that the Third and Seventh Circuits have determined to be "only tenuously related to the ultimate activity regulated," and "almost useless" for purposes of establishing Commerce Clause jurisdiction, *Rodia,* 194 F.3d at 473, a view with which we are in agreement. *See supra* II.B.3. In its colorful manner, the dissent accuses us of fly-swatting; in truth, we are confronted with the elephant in the bathtub. Were we of a mind to engage in the same mode of commentary as the dissent, we would add "it's the Constitution, amigo." *See* dissent, *infra* at 4074. In sum, a thorough review of the *Morrison* factors persuades us that, *as applied* to McCoy and others similarly situated, § 2252(a)(4)(B) cannot be upheld as a valid exercise of the Commerce Clause power. Like the Sixth Circuit, we agree that there are some categories of conduct which, whether or not literally covered by a statute on its face, cannot be said to "substantially affect" interstate commerce. *Corp,* 236 F.3d at 332–33; *Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624. Such conduct includes the non-commercial, non-economic, simple intrastate possession of photographs for personal use, which formed the basis of McCoy's federal conviction.

*III. CONCLUSION*

We hold that § 2252(a)(4)(B)'s application to the simple intrastate possession of a visual depiction (or depictions) that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution or for economic or commercial use, including the exchange of the prohibited material for other prohibited material, cannot be justified under the Commerce Clause. If punishment for the conduct in which McCoy engaged is desirable and lawful, it is the state that must

seek to attain that result, not the federal government. The statute is unconstitutional as applied.

Accordingly, we REVERSE the judgment of the district court, and REMAND with instructions to dismiss the superseding information.

REVERSED and REMANDED.

TROTT, Circuit Judge, dissenting.

My colleagues have finessed an unavoidable issue in this case: whether 18 U.S.C. § 2252(a)(4)(B) is unconstitutional on its face. They have attempted to restrict their holding to McCoy and to others "similarly situated," but it is not clear to me that the law permits such a limitation. I so conclude because McCoy's conduct clearly falls within the language of the statute, and because the Supreme Court appears under such circumstances to have ruled out "as applied" challenges in Commerce Clause cases. In my view, if the conduct under review falls within the plain language of the statute, precedent requires us to take the statute head on, not carve pieces out of it. Because I disagree with my colleagues' approach to the issues as well as to their holding, I respectfully dissent.

**I**

Among the first principles one learns when studying the Constitution in law school is that our federal government is one of "enumerated powers." *McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 405, 4 L.Ed. 579 (1819). As the Supreme Court has explained, "Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the states except as Congress, acting within the scope of those delegated powers, has created offenses against the United States." *Screws v. United States,* 325 U.S.

91, 109, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion). This structural concept means that our federal government can exercise "only the powers granted to it." *McCulloch,* 17 U.S. at 405. In other words, Congress does not possess "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez,* 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Any law enacted by Congress that is not rooted in one of these powers is unconstitutional. *See United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (striking down the civil remedy provisions of the Violence Against Women Act as an unconstitutional exercise of Congress' Commerce Clause authority). And, although such an unauthorized law would be "unconstitutional" if passed by the Congress of the United States, such a genealogical defect would not render a state government powerless to enact the same rule.

One of the powers granted to Congress by the Constitution is the authority "to regulate commerce ... among the several states...." U.S. Const. art. I, § 8, cl. 3. In this regard, the Supreme Court has identified "three broad categories of activity that Congress may regulate under its commerce power." *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. They are (1) the use of channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) those activities that "substantially affect" interstate commerce. *Id.* at 558–59, 115 S.Ct. 1624. It is the third category that poses the challenging question that when answered will decide the outcome of this case, i.e., whether 18 U.S.C. § 2252(a)(4)(B) which prohibits the simple intrastate possession of child pornography, whether commercial or not, that has been made with materials that traveled in interstate commerce is a valid exer-

cise of Congress' Commerce Clause authority.

**II**

I come at this case from an analytical perspective different from my friends in the majority. They focus on the particulars of Rhonda McCoy's responsibility for the pathetic single photograph that supports her conviction, and they conclude from the details of her case—which they distill into a single category—that the statute at issue "as applied" to her circumstances is an unconstitutional exercise of Congress' power. My compassionate friends are not incorrect in describing the underlying microcosmic facts of *this* case as (1) wholly personal, (2) not commercial, (3) strictly intrastate, and (4) the product of an isolated alcohol—fueled episode—all suggesting that Rhonda McCoy and her family need help, not federal prison. However, I conclude, based on Supreme Court precedent, that the majority's legal approach is not correctly grounded. The real determinative question is whether the activity generically described in the *statute* has a substantial effect on interstate commerce such that it is subject to criminalization by Congress.

The reason why I believe the majority's approach is not viable is simple: the Supreme Court said in *Lopez* that "where *a general regulatory statute bears a substantial relation to commerce, the de minimis* character of individual instances arising under that statute is of no consequence." *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624 (emphasis in original) (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), *overruled on other grounds by Nat'l League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *over-ruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.,* 469

U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). I take this passage in *Lopez* to mean here precisely what it says: the de minimis nexus of Rhonda McCoy's personal activity to interstate commerce is of "no consequence," so long as (1) her conduct falls within the purview of the statute, as she has stipulated, and (2) the *statute* itself which covers that activity is valid. The Court in *Lopez* articulated this clarification to make it clear that although Congress may not use a "relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities," *id.*, if the general regulatory statute at issue does bear a substantial relation to commerce, an "as applied" challenge is inappropriate.

The facts underlying the Court's decision in *Wirtz* are not only interesting, but instructive. Under attack in *Wirtz* as an alleged violation of the scope of Commerce Clause authority was a decision by Congress to include within the reach of the Fair Labor Standards Act of 1938 a new class of employees argued by *Wirtz* to have no connection whatsoever to traditional interstate commerce, such as employees of (1) hospitals, (2) institutions devoted to the care of the aged, disabled, or handicapped, and (3) schools. The Supreme Court rejected this attack because it concluded that the employees in question were within the well-established "enterprise concept," which means that although the work that they themselves were doing was not typically connected to interstate commerce, the *enterprise* for which they worked was so connected, as were some of their fellow employees. What the Court said about the enterprise concept and Congress' decision to rely on it in expanding the Fair Labor Standards Act sheds dispositive light on whether "as applied" challenges are appropriate in this context:

> Whether the "enterprise concept" is defended on the "competition" theory or on the "labor dispute" theory, it is true

that labor conditions in businesses having only a few employees engaged in commerce or production may not affect commerce very much or often. Appellants therefore contend that defining covered enterprises in terms of their employees is sometimes to permit "the tail to wag the dog." However, while Congress has in some instances left to the courts or to administrative agencies the task of determining whether commerce is affected in a particular instance, *Darby* [312 U.S. 100, 61 S.Ct. 451 (1941)], itself recognized the power of Congress instead to declare that an entire class of activities affects commerce. The only question for the courts is then *whether the class is "within the reach of the federal power." The contention that in Commerce Clause cases the courts have power to excise, as trivial, individual instances falling within a rationally defined class of activities has been put entirely to rest. Wickard v. Filburn*, 317 U.S. 111, 127–128, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

*Wirtz*, 392 U.S. at 192–93, 88 S.Ct. 2017 (emphasis added) (footnotes omitted).

The Supreme Court in *Usery*, 426 U.S. at 855, 96 S.Ct. 2465, overruled *Wirtz*, but only insofar as *Wirtz* stood for the proposition that Congress could use the authority of the Commerce Clause to invade the domain of the States' performance of essential government functions. In other regards, *Wirtz's* Commerce Clause jurisprudence remains intact, as demonstrated by the Court's approving reference to it in *Lopez*. As the Court explained in *Usery*,

> Appellants in no way challenge these decisions[, i.e., *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964),] establishing the breadth of authority granted Con-

gress under the commerce power. Their contention, on the contrary, is that when Congress seeks to regulate directly the activities of States as public employers, it transgresses an affirmative limitation on the exercise of its power akin to other commerce power affirmative limitations contained in the constitution.

*Usery,* 426 U.S. at 841, 96 S.Ct. 2465.

One of the leading cases that illustrates the application of these principles is *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Roscoe Filburn was a private farmer. In 1941, he produced 462 bushels of wheat on his own land, mostly for his own consumption. Although he sold a small portion of his wheat locally, he did not sell or ship it in interstate commerce. Unfortunately, Roscoe grew more wheat that year than the marketing quota allowed by the federal Agricultural Adjustment Act of 1938. Wickard, the Secretary of Agriculture, determined based on the total amount of wheat produced that Roscoe should pay a penalty of $117.11 for this transgression, but the district court enjoined Wickard's proposed penalty and enforcement of the Act against Roscoe with respect to his 1941 crop. *Filburn v. Helke,* 43 F.Supp. 1017(S.D.Ohio 1942).

The Supreme Court reversed the district court, noting first of all that the wheat industry as a macrocosm "has been a problem industry for some years." *Wickard,* 317 U.S. at 125, 63 S.Ct. 82. The Court then described in commercial terms the national as well as the international dimensions of the problem, dimensions involving supply, demand, price to the grower, and cost to the consumer. From this discussion, the Court concluded that Congress was well within its Commerce Clause authority to regulate the production of wheat, even particular wheat that had no connection to interstate commerce. In the subsequent words of *Wirtz,* Congress had rationally identified wheat as a "defined class of activities" with national economic overtones. 392 U.S. at 194, 88 S.Ct. 2017. The Court simply turned a deaf constitutional ear to Roscoe's request that his tiny crop and purely local circumstances could not be reached by the Act. In turning away Roscoe's "as applied" challenge, the Court said,

> The maintenance by government regulation of a price for wheat undoubtedly can be accomplished as effectively by sustaining or increasing the demand as by limiting the supply. The effect of the statute before us is to restrict the amount which may be produced for market and the extent as well to which one may forestall resort to the market by producing to meet his own needs. That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.

*Wickard,* 317 U.S. at 127–28, 63 S.Ct. 82.

These principles were recently restated by the Eleventh Circuit in *United States v. Ballinger,* 312 F.3d 1264, 1270 (11th Cir. 2002):

> When the regulated intrastate activity is a commercial or economic one, the Constitution permits the required substantial effect on interstate commerce to be located in the *aggregate* impact of the regulated activity upon interstate commerce. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The Court has held that "where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." *Wirtz,* 392 U.S. at 197, n. 27, 88 S.Ct.

2017. The Constitution permits such aggregation of effects to justify congressional regulation of purely intrastate economic activity when the absence of such regulation would undercut a larger regulatory scheme affecting interstate commerce. *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624.

(Emphasis in original).

*Ballinger* then illustrates the distinction between economic and non-economic activity, and points out that Congress' attempted regulation of activity failed in *Morrison* because the activity, violence against women, was generically non-economic. As the Supreme Court said in *Morrison,* "a fair reading of *Lopez* shows that the non-economic, criminal nature of the conduct at issue was central to our[rejection of such regulation] in that case." *Morrison,* 529 U.S. at 610, 120 S.Ct. 1740. In *Lopez,* the Court was influenced by the fact that the Gun Free School Zone Act had "nothing to do with 'commerce' or any sort of economic enterprise." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624.

Eight days after the decision in *Morrison,* the Supreme Court tackled another case allegedly involving the Commerce Clause: *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). In *Jones,* the Court was asked by Jones to hold that the use of the federal arson statute, 18 U.S.C. § 844(I), to prosecute him for firebombing an owner-occupied private residence which was not used for any commercial purpose exceeded the authority of Congress under the Commerce Clause. Jones had "unsuccessfully urged, both before the district court and on appeal to the Seventh Circuit, that § 844(I), *when applied* to the arson of a private residence ..." was unconstitutional. *Jones,* 529 U.S. at 851, 120 S.Ct. 1904 (emphasis added). The Court ultimately avoided the constitutional question—and here is the rub—by interpreting the plain language of the arson statute so as not to reach the type of structure Jones had destroyed by fire. The court said, "We conclude that § 844(I) is not soundly read to make virtually every arson in the country a federal offense. We hold that the provision ['property used in interstate commerce'] covers only property currently used in commerce or in an activity affecting commerce." *Id.* at 859, 120 S.Ct. 1904. *See also United States v. Pappadopoulos,* 64 F.3d 522, 528 (9th Cir.1995) (the jurisdictional element found in 18 U.S.C. § 844(I) does not cover the simple arson of a non-commercial private residence). Had the plain language of the arson statute encompassed the structure destroyed by Jones, as the statute here clearly covers McCoy's behavior, then the Court would have had no choice but to deal with the statute's constitutionality in Commerce Clause terms. I will discuss the ramifications of *Jones* in part IV of this opinion.

### III

Thus, the resolution of this case boils down to whether the statute under review, 18 U.S.C. § 2252(a)(4)(B) which encompasses a certain kind of intrastate possession, passes Commerce Clause muster, *not* whether McCoy's categorically peculiar circumstances have a pellucid nexus to interstate commerce. The answer to this question, of course, emerges from an application of the four-factor *Morrison* test:

(1) whether the statute regulates commerce, or any activity that might be deemed an economic activity, broadly defined; (2) whether the statute has an express jurisdictional element that restricts its application to activities that have an explicit connection with or effect on interstate commerce; (3) whether congressional findings support the judgment that the *activity in question* has a substantial effect on inter-state com-

merce; and (4) whether the [activity] made an offense has an attenuated relationship to that substantial effect on interstate commerce. [*Morrison*, 529 U.S. at 610–12, 120 S.Ct. 1740.]

*United States v. Kallestad*, 236 F.3d 225, 228 (5th Cir.2000) (quotation marks omitted).

### A.

It seems to me that the answer to the first question is clear. Congress has determined on many occasions that child pornography of all kinds and whether it is personal or explicitly commercial has turned into a massive national industry, one wherein photographs, film, and prurient images of children are bought and sold as a commodity at market for monetary consideration. In 1984, Congress said:

The Congress finds that—

(1) child pornography has developed into a highly organized, multi-million dollar industry which operates on a nationwide scale;

(2) thousands of children including large numbers of runaway and homeless youth are exploited in the production and distribution of pornographic materials;

(3) the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the individual and society.

Child Protection Act of 1984, Pub.L. No. 98–292, § 2, 98 Stat. 204 (1984). The 1986 legislation on the same subject said:

The Congress finds that—

(1) child exploitation has become a multi-million dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children.

Child Abuse Victims Rights Act of 1986, Pub.L. no. 99–591, § 702, 100 Stat. 3341 (1986).

Therefore, federal child pornography laws—unlike the Gun Free School Zone Act struck down in *Lopez* and the Violence Against Women Act invalidated in *Morrison*—were intended by Congress first and foremost to attack an item that although illicit in nature had spawned a vast interstate economic market. The underground and perverted product is certainly disgusting, but it has become—like drugs or stolen cars—a commercial product nonetheless. *See United States v. Cortes*, 299 F.3d 1030, 1037 (9th Cir.2002) (carjacking is both a crime of violence and an economic crime). Thus, these laws easily pass the first step of the *Morrison* test.

Other circuits agree with and support this conclusion. *See United States v. Robinson*, 137 F.3d 652 (1st Cir.1998); *United States v. Rodia*, 194 F.3d 465 (3rd Cir. 1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000); *United States v. Kallestad*, 236 F.3d 225 (5th Cir. 2000); *United States v. Angle*, 234 F.3d 326 (7th Cir.2000), *cert. denied*, 533 U.S. 932, 121 S.Ct. 2556, 150 L.Ed.2d 722 (2001); *United States v. Bausch*, 140 F.3d 739 (8th Cir.1998), *cert. denied*, 525 U.S. 1072, 119 S.Ct. 806, 142 L.Ed.2d 667 (1999).

### B.

Next, we must address whether the statute contains an express jurisdictional element that restricts its application to activities that have an explicit connection with or effect on interstate commerce. Unlike the statutes at issue in *Morrison* and *Lopez*, § 2252(a)(4)(B) is restricted to possession of child pornography

that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was pro-

duced using materials which have been mailed or so shipped or transported, by any means including by computer, if

> (I) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>
> (ii) such visual depiction is of such conduct.

18 U.S.C. § 2252(a)(4)(B).

The presence in this statute of a jurisdictional element restricting the reach of the statute indicates that Congress regarded this statute as an exercise of its Commerce Clause power, not simply as a broad net cast over purely intrastate crime of which it disapproved. As the Fifth Circuit said in *Kallestad,* 236 F.3d at 229, "What the jurisdictional hook does accomplish in this case ... is to limit prosecutions under section 2252(a)(4)(B) to a smaller universe of provable offenses. It further reflects Congress's sensitivity to the limits upon its commerce power, and Congress's express interest in regulating national markets."

Not all circuits agree with this analysis. The Third Circuit in *Rodia* and the Seventh Circuit in *Angle* have determined that the connection between the jurisdictional hook and the activity being regulated is so attenuated that it "fail[s][by itself] to guarantee that the activity regulated has a substantial effect on interstate commerce." *Rodia,* 194 F.3d at 472; *see also Angle,* 234 F.3d at 336–37. Nevertheless, and notwithstanding the failure of the jurisdictional hook, *Angle* and *Rodia* affirmed the statute because of the satisfactory nexus between interstate commerce and the activity regulated. I agree with this result. *Rodia,* 194 F.3d at 482; *Angle,* 234 F.3d at 338.

### C.

When reading the various iterations of Congress' child pornography legislation and the numerous findings that support each enhancement of this initiative, it is clear to me that Congress sees child pornography as a "growing, predatory business that exploits and injures the most vulnerable among us" and "that the child pornography trade operates across the United States, out of major cities and small towns alike, to reach consumers nationwide." *Kallestad,* 236 F.3d at 229. These findings, as far as my reading of them is concerned, collectively establish that purely local possession impacts interstate commerce.

### D.

We come finally to the heart of the matter: whether the activity described in the statute has a substantial effect on interstate commerce, or whether it is too attenuated therefrom. Starting from the proposition that we have on our analytical plate a product that is bought, sold, and traded nationally, I agree with the Seventh Circuit in *Angle,* which agrees in turn with *Rodia:*

> Angle's contention that intrastate possession of child pornography has little or no bearing on inter-state commerce ignores the interstate demand for child pornography which Congress took into consideration in enacting the statutory scheme under § 2252. For instance, Congress found that " 'child pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale,' and 'that such prostitution and the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce.' " *United States v. Winningham,* 953 F.Supp. 1068, 1074 n. 13 (D.Minn.1996) (quoting S.Rep. No. 95438, at 3–5 (1978), reprinted in 1978 U.S.C.C.A.N. 40, 42–43). There can be no debate that "interstate trafficking in child pornography has an effect on inter-

state commerce." *Rodia*, 194 F.3d at 474. However, Congress amended § 2252 in late 1988 to include the clause at issue here, in large part, to close a loophole in the original regulatory scheme which was being "undercut by the child pornographers who continued to manufacture their own pornography intrastate." *Id.* at 479

We agree with the Third Circuit that, by adding § 2252(a)(4)(B) to the regulatory scheme, Congress could have rationally reasoned as follows:

> Some pornographers manufacture, possess, and use child pornography exclusively within the boundaries of a state, and often only within the boundaries of their own property. It is unrealistic to think that those pornographers will be content with their own supply, hence they will likely wish to explore new or additional pornographic photographs of children. Many of those pornographers will look to the interstate market as a source of new material, whether through mail order catalogs or through the Internet. Therefore, the possession of "home grown" pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography. It is also reasonable to believe the related proposition that discouraging the intrastate possession of pornography will cause some of these child pornographers to leave the realm of child pornography completely, which in turn will reduce the interstate demand for pornography.

*Id.* at 477.

With this understanding of individual behavior in a market system, Congress could have rationally believed that intrastate possession of child pornography bears a substantial relationship to interstate commerce. Moreover, as the First Circuit observed:

> By outlawing the purely intrastate possession of child pornography in § 2252(a)(4)(B), Congress can curb the nationwide demand for these materials. We believe that such possession, "through repetition elsewhere," helps to create and sustain a market for sexually explicit materials depicting minors.

*Robinson*, 137 F.3d at 656(quoting *Lopez*, 514 U.S. at 567, 115 S.Ct. 1624, 131 L.Ed.2d 626). We join the First and Third Circuits in finding that there is a nexus, via a market theory, between interstate commerce and the intrastate possession of child pornography.

*Angle*, 234 F.3d at 337–38.

## IV

My colleagues may have exceeded what the law permits. They have rendered an opinion on the validity of the statute "as applied," but I do not believe they have that option. McCoy's particular conduct, as wan as it may appear to each of us, clearly falls within the purview of the plain language of the statute under any statutory construction of it, including the jurisdictional element. Unlike what the Supreme Court did in *Jones*, it is impossible to read McCoy out of the statute. Simply put, she possessed child pornography (a stipulated fact) produced using materials transported in interstate and foreign commerce. The upshot of condemning the statute "as applied" therefore is either (1) tantamount to condemning the statute, *hic sepultus*, on its face as overbroad, or (2) construing the statute as the Supreme Court did in *Jones* as not covering intrastate non-commercial possession. Holding this statute unconstitutional as applied to McCoy's conduct, or, as described by the majority, to "simple intrastate possession of a visual depiction that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution, or for economic or commercial use," may render unconsti-

tutional *all* intrastate child pornography possession prosecutions, even those where the production materials moved in interstate commerce and the child pornography was not "personal" in nature.

Congress has declared that an entire class of activities substantially affects interstate commerce. That activity is child pornography. *To the statute*, it is immaterial that the particular child pornography under scrutiny was not produced for sale or trade. As reiterated in *Usery*, "[e]ven activity that is purely intrastate in character may be regulated by Congress, where that activity, combined with the like conduct of others similarly situated affects commerce among the states...." *Id.* at 840, 96 S.Ct. 2465 (quoting *Fry*, 421 U.S. at 547, 95 S.Ct. 1792).

> Congressional power over areas of private endeavor, even when its exercise may pre-empt express state law determinations contrary to the result which has commended itself to the collective wisdom of Congress, has been held to be limited only by the requirement that "the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution."

*Id.* (quoting *Heart of Atlanta Motel, Inc.*, 379 U.S. at 262, 85 S.Ct. 348).

This case is not free from doubt, as Judge Reinhardt's well-articulated opinion concludes; and I am not oblivious to the difference between wheat and child pornography. They are as different as chalk and cheese. But, as generic commodities determined by Congress to be part of a national market, they both are subject to Commerce Clause regulation. Therefore, the factual non-commercial nature of a single item of the commodity is immaterial.

Justice Jackson made additional comments in *Wickard* about the Commerce Clause that must inform our analysis in this case. Referring to Chief Justice Marshall's words in *Gibbons v. Ogden*, 9

Wheat. 1, 22 U.S. 1, 197, 6 L.Ed. 23 (1824), Jackson said, [Marshall] made emphatic the embracing and penetrating nature of [the Commerce Clause] power by warning that effective restraints on its exercise must proceed from political rather than judicial processes. *Wickard*, 317 U.S. at 120, 63 S.Ct. 82. What I take this passage to mean in the light of *Lopez* and *Morrison* is not that there are no constitutional limits on Congress' use of Commerce Clause authority, but that courts must be hesitant to substitute judicial for legislative judgment. Whatever a valid statute covers or reaches is fair game. As a paraphrase of the current saying goes, "It's the *statute*, amigo."

With Justice Jackson's words in mind that these discrete decisions and distinctions belong to the political rather than the judicial process, I cannot conclude that Congress acted beyond its authority to include *all* intrastate child pornography produced with "interstate materials" within this statutory framework. Thus, I respectfully dissent.