**COUNTY OF SANTA CRUZ, CALIFORNIA; City of Santa Cruz, California; Valerie Corral; Eladio V. Acosta; James Daniel Baehr; Michael Cheslosky; Jennifer Lee Hentz; Dorothy Gibbs; Harold F. Margolin; and Wo/ Men's Alliance for Medical Marijuana, Plaintiffs,**

v.

**John ASHCROFT, Attorney General of the United States; William B. Simpkins, Acting Administrator of the Drug Enforcement Administration; John P. Walters, Director of the Office of National Drug Control Policy; and 30 Unknown Drug Enforcement Administration Agents, Defendants.**

**No. C–03–1802 JF.**

United States District Court,
N.D. California,
San Jose Division.

Aug. 28, 2003.

Benjamin Rice, Gerald Uelmen, John G. Barisone, Atchison, Barisone & Condotti, Santa Cruz, CA, Daniel Abrahamson, Drug Policy Alliance, Office of Legal Affairs, Oakland, CA, Frank Kennamer, Bingham, McCutchen, LLP, San Francisco, CA, Judith Appel, Drug Policy Alliance, Office of Legal Affairs, Oakland, CA, Lauri A. Schumacher, Neha Shah Nissen, Troy Sauro, Bingham, McCutchen, LLP, San Francisco, CA, for Plaintiffs.

Mark Thomas Quinlivan, U.S. Department of Justice, Washington, DC, for Defendants.

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

FOGEL, District Judge.

Plaintiffs seek a preliminary injunction enjoining Defendants from conducting further raids or seizures against Plaintiff Wo/Men's Alliance for Medical Marijuana ("WAMM") and its member-patients, and from conducting raids or seizures against patients using marijuana for medicinal purposes in compliance with California's medicinal marijuana statute within the City and County of Santa Cruz. Defendants move to dismiss Plaintiffs' complaint. Both motions are opposed. The Court has read and considered the briefing and evidence submitted by the parties and has considered the arguments of counsel presented at the hearing on July 7, 2003. For the reasons set forth below, Plaintiffs' motion for preliminary injunction will be denied and Defendants' motion to dismiss will be granted with leave to amend.

## I. BACKGROUND

Plaintiff WAMM is a collective hospice organization located in Davenport, California that maintains an office in Santa Cruz, California. *See* Declaration of Valerie Corral ("Corral Decl.") ¶ 10. It has approximately 250 member-patients who suffer from HIV or AIDS, multiple sclerosis, glaucoma, epilepsy, various forms of cancer, and other serious illnesses. *See id.* The vast majority of WAMM members are terminally ill. *See id.* WAMM assists seriously ill and dying patients by providing them with the opportunity to cultivate marijuana plants for their personal medici-

nal use and to produce marijuana medications collectively used by WAMM members to alleviate their pain and suffering. *See id.* ¶¶ 13, 18. Both the cultivation and use of marijuana by WAMM members are carried out only on the recommendation of the patients' respective physicians in compliance with California's medicinal marijuana statute. *See id.* ¶¶ 11, 13. Members of WAMM assist in cultivating marijuana plants to the extent of their physical abilities; they do not purchase, sell, or otherwise distribute marijuana. *See id.* ¶¶ 11, 13, 20. WAMM also provides community support to seriously ill and dying patients through weekly meetings and other forms of outreach. *See id.* ¶ 12. WAMM is supported by voluntary contributions, and its members are not charged for their use of marijuana. *See id.* ¶ 20.

Plaintiff Valerie Corral, the executive director of WAMM, and her husband Michael Corral, her primary caregiver, founded the organization in 1993. *See id.* ¶ 10. The Corrals reside on a farm in Davenport, California, where they permit members of WAMM to cultivate marijuana plants for medicinal use. *See id.* Valerie Corral and Plaintiffs Eladio V. Acosta, James Daniel Baehr, Michael Cheslosky, Jennifer Lee Hentz, Dorothy Gibbs, and Harold F. Margolin (collectively "the Patient–Plaintiffs") use medicinal marijuana on the recommendation of their respective physicians to alleviate pain and suffering caused by their illnesses and to treat certain other symptoms.

The Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.* ("CSA"), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).[1] The CSA divides

1. The CSA includes extensive and specific Congressional declarations and findings, including declarations as to the effect of intrastate activities involving controlled substances on interstate commerce:

> (1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.
> (2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.
> (3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because-
> > (A) after manufacture, many controlled substances are transported in interstate commerce,
> > (B) controlled substances distributed locally usually have been transported in

> interstate commerce immediately before their distribution, and
> > (C) controlled substances possessed commonly flow through interstate commerce immediately prior to such possession.
> (4) Local distribution and possession of controlled substances contribute to swelling the interstate traffic in such substances.
> (5) Controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate. Thus, it is not feasible to distinguish, in terms of controls, between controlled substances manufactured and distributed interstate and controlled substances manufactured and distributed intrastate.
> (6) Federal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic.
> (7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances.
> 21 U.S.C. § 801(1)-(7).

drugs and certain other substances into five categories, or schedules, that impose varying restrictions on access to a drug according to the schedule in which the drug has been placed. *See* 21 U.S.C. § 812(a). A drug is assigned to Schedule I, the most restrictive schedule, if (1) it "has a high potential for abuse," (2) it "has no currently accepted medical use in treatment in the United States," and (3) "[t]here is a lack of accepted safety for use of the drug ... under medical supervision." 21 U.S.C. § 812(b)(1). Marijuana is assigned by statute to Schedule I. *See* 21 U.S.C. § 812(c).[2] "Schedule I drugs may be obtained and used lawfully only by doctors who submit a detailed research protocol for approval by the Food and Drug Administration and who agree to abide by strict recordkeeping and storage rules." *Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 15 F.3d 1131, 1133 (D.C.Cir.1994).

California's medicinal marijuana statute, the Compassionate Use Act of 1996, was enacted by California voters on November 5, 1996, when they passed Proposition 215. *See* Cal. Health & Safety Code § 11362.5. The statute creates an exemption from state laws that prohibit the cultivation and use of marijuana by permitting patients and their primary caregivers to possess and cultivate marijuana for personal medicinal use upon a physician's recommendation or approval. *Id.* § 11362.5(d). There is no dispute that the activities of WAMM and the Patient–Plaintiffs, each of whose primary caregiver also is a WAMM member, are legal under the statute.

Prior to passage of Proposition 215, Plaintiff County of Santa Cruz ("the Coun-

ty") had adopted an ordinance directing County officials to use their authority to support the availability of marijuana for medicinal use. *See* Santa Cruz County Code Ch. 7.122.020—7.1222.060. Following enactment of the Compassionate Use Act of 1996 by California voters, Plaintiff City of Santa Cruz ("the City") enacted additional legislation to facilitate implementation of the statute. *See* Santa Cruz Municipal Code Ch. 6.90.010, *et seq.* Among other things, the City's medicinal marijuana ordinance authorizes the City to deputize individuals and organizations as medicinal marijuana providers to assist the City in implementing the statute. *Id.* Ch. 6.90.040(1).

On September 5, 2002, between twenty and thirty armed agents led by officers of the federal Drug Enforcement Administration ("DEA") arrived at the Corrals' property to execute a search warrant. *See* Corral Decl. ¶ 27. The DEA agents forcibly entered the premises, pointed loaded firearms at the Corrals, forced them to the ground, and handcuffed them. *See id.* The Corrals subsequently were transported to the federal courthouse in San Jose, where they were released without being charged. *See id.* ¶ 27, 28. DEA agents remained on the premises for eight hours, seizing 167 marijuana plants, many of the WAMM members' weekly allotments of medicinal marijuana, various documents and records, and other items. *See id.* ¶ 28.

Less than two weeks after the DEA's September 5, 2002 raid, the County's Board of Supervisors adopted a resolution condemning the raid and urging the federal government not to indict the Corrals for their activities. *See* Ex. B to Declaration

---

**2.** The criteria for Schedule II are: (1) the drug "has a high potential for abuse," (2) it "has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions," and (3) "[a]buse of the drug ... may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2). Drugs assigned to Schedule II include codeine, coca leaves, morphine, methadone, and methamphetamine. *See* 21 C.F.R. § 1308.12.

of Ellen Pirie ("Pirie Decl."). On September 17, 2002, the City permitted WAMM members to receive their weekly allotments of medicinal marijuana at the Santa Cruz City Hall. *See* Corral Decl. ¶ 33; Declaration of Emily Reilly ("Reilly Decl.") ¶ 5. The City Council subsequently adopted a resolution deputizing WAMM and the Corrals to function as City-authorized medicinal marijuana providers pursuant to the City's medicinal marijuana ordinance. *See* Ex. A to Reilly Decl.

On September 24, 2002, WAMM and the Corrals filed a related action against the federal government in this Court seeking return of the marijuana plants and other property seized in the September 5, 2002 raid pursuant to Federal Rule of Criminal Procedure 41(e). *See Wo/Men's Alliance for Medical Marijuana, et al. v. United States,* No. 02–MC–7012 JF (N.D. Cal. filed Sept. 24, 2002).[3] The movants argued that their conduct did not affect interstate commerce and that application of the CSA to such conduct thus constituted an unlawful exercise of Congressional powers under the Commerce Clause. This Court concluded, however, that disposition of the movants' motion was controlled by Ninth Circuit precedent that precluded the relief sought. Accordingly, the Court denied the motion for return of property by order issued December 3, 2002. *See Wo/Men's Alliance for Med. Marijuana v. United States,* No. 02–MC–7012 JF, 2002 U.S. Dist. LEXIS 26389 (N.D.Cal. Dec. 3, 2002). That decision has been appealed to the United States Court of Appeals for the Ninth Circuit, and the appeal is scheduled for oral argument in mid-September 2003.

On April 23, 2003, Plaintiffs filed the instant action against Defendants John Ashcroft, Attorney General of the United States; John B. Brown III, Acting Administrator of the DEA[4]; John P. Walters, Director of the Office of National Drug Control Policy; and 30 Unknown DEA Agents, seeking to enjoin alleged violations of their constitutional rights. They assert the following claims: (1) deprivation of fundamental rights under the Fifth and Ninth Amendments to alleviate pain and suffering and to control the circumstances of one's own death; (2) deprivation of the fundamental right to follow the recommendations of one's physician; (3) unlawful exercise of Congressional powers under the Commerce Clause; and (4) violation of the Tenth Amendment. Plaintiffs also seek a declaration that WAMM and Valerie Corral are immune from civil and criminal liability under the Controlled Substances Act for their activities, as well as damages for Defendants' alleged violations of their constitutional rights.

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

The primary purpose of a preliminary injunction is to preserve the *status quo* pending a trial on the merits. *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). A party seeking a preliminary injunction must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips in its favor. *Roe v. Anderson,* 134 F.3d 1400, 1401–02 (9th Cir.1998), *aff'd, Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).

---

**3.** The City and County are not parties to the related action.

**4.** Pursuant to Federal Rule of Civil Procedure 25(d)(1), William B. Simpkins, Acting Administrator of the DEA, was automatically substituted as a party for his predecessor, John B. Brown III.

These formulations represent "two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987). However, "'even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits.'" *Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995) (citing *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.1984)). Depending on the nature of the case, the court also may consider whether the public interest will be advanced by granting the requested relief. *Id.*; *Westlands Water Dist. v. Natural Resources Defense Council*, 43 F.3d 457, 459 (9th Cir.1994).

## B. Motion to Dismiss

A complaint may be dismissed only if it is certain that the plaintiff can prove no set of facts entitling him or her to relief. *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When a court considers a motion to dismiss, all factual allegations in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). "However, the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–755 (9th Cir.1994). A court's review is limited to the face of the complaint, documents referenced by the complaint the authenticity of which is not contested, and matters of which the court may take judicial notice. *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996),

*cert. denied, Anderson v. Clow*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

When the court grants a motion to dismiss, "leave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *United States v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir.2001) (citing *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000)).

## III. DISCUSSION

### A. Motion for Preliminary Injunction

#### 1. Irreparable Injury

 Under any formulation of the test for obtaining a preliminary injunction, the moving party must demonstrate that there is a significant threat of irreparable injury. *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir.1985). Accordingly, the Court first will assess whether Plaintiffs are likely to suffer irreparable injury if they are denied the requested relief.

Plaintiffs assert that Defendants' actions have caused them, and will continue to cause them, irreparable harm. The Patient–Plaintiffs maintain that they already have suffered severe damage to their health as a result of the DEA's September 5, 2002 raid and seizure of their marijuana plants. This Court determined in the related action that WAMM and Valerie Corral had made a sufficient showing that they would suffer irreparable injury if the seized marijuana plants were not returned. *See Wo/Men's Alliance for Med. Marijuana*, 2002 U.S. Dist. LEXIS 26389 at *6. The Patient–Plaintiffs have submitted declarations in the present case that establish clearly the harm they have suffered and continue to suffer because of Defendants' actions and because they are denied access

to medicinal marijuana. *See* Corral Decl. ¶¶ 29, 34; Declaration of Eladio V. Acosta ¶¶ 15–18; Declaration of James Daniel Baehr ¶¶ 14, 20–21; Declaration of Michael Cheslosky ¶¶ 18–21; Declaration of Jennifer Lee Hentz ¶¶ 20–25, 28; Declaration of Dorothy Gibbs ¶¶ 19, 21, 23; Declaration of Harold F. Margolin ¶¶ 20–22. Valerie Corral asserts in her declaration that the deaths of at least three WAMM members during the past nine months were hastened significantly by and were made more agonizing because of Defendants' actions. *See* Corral Decl. ¶¶ 30–32. In addition, the City and County claim that they will suffer continued harm as a result of the federal government's alleged interference with their ability to provide for the health and welfare of their citizens. *See* Pirie Decl. ¶ 5; Reilly Decl. ¶ 11.

Despite the substantial evidence of irreparable harm submitted by Plaintiffs, Defendants maintain that Plaintiffs cannot establish a legally cognizable injury in light of *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001), in which the Supreme Court rejected the patient-defendants' medical necessity defense that was based on an alleged need for medicinal marijuana. *Id.* at 493–95, 121 S.Ct. 1711. None of the Plaintiffs in the instant action, however, has been charged with any crime in connection with the activities at issue, and thus the unavailability of a medical necessity defense in prosecutions for use or possession of medicinal marijuana under the CSA does not necessarily preclude this Court from finding that Plaintiffs have suffered irreparable harm.

Defendants also contend that consideration of the public interest militates against granting the requested relief because of the presumed constitutionality of federal statutes and regulations that control the use and possession of marijuana and that establish procedures for reclassification and decontrol of controlled substances. The voters of California, however, through their enactment of the Compassionate Use Act of 1996, and the City and County through their respective medicinal marijuana ordinances, also have articulated strong public interest considerations.

There is a robust and ongoing debate as to whether the public interest in fact is served by the DEA's use of its limited resources to target for raids and potential prosecution seriously ill and dying patients such as the Patient–Plaintiffs, who use and possess marijuana only for medicinal purposes. *See, e.g., Conant v. Walters,* 309 F.3d 629 (9th Cir.2002) (concurring opinion of Kozinski, J., and authorities cited therein). The federal government itself has distributed medicinal marijuana to seriously ill individuals around the country since 1978 as part of its Investigative New Drug Program. *Id.* at 648. Patients who participate in the program receive monthly allotments of marijuana grown at a federal marijuana research facility. Plaintiffs assert that although the program, which they claim included approximately eighty patients at its peak, was closed to new patients in 1992, six patients continue to this day to receive monthly allotments of medicinal marijuana. Arguably, the continued distribution of medicinal marijuana as part of the federal government's own Investigative New Drug Program suggests that there is at least some legitimate public interest in permitting certain seriously ill or terminally ill patients to use marijuana for medicinal purposes.

Based on the record before it, the Court will proceed on the assumption that the Patient–Plaintiffs adequately have demonstrated that they face a significant threat of irreparable harm because of Defendants' actions.

### 2. Likelihood of Success on the Merits

Plaintiffs make several arguments in support of their contention that they are likely to succeed on the merits of their claims; the Court will address these arguments in turn. Plaintiffs also request that this Court recognize explicitly for the first time a constitutionally protected right to use physician-recommended medication to alleviate pain and suffering and to control the circumstances of one's own death.

### a. Fundamental Rights to Maintain Bodily Integrity, Alleviate Pain and Suffering, and Control the Circumstances of One's Own Death

 Plaintiffs first claim that Defendants' enforcement of the CSA under the circumstances of this case violates their fundamental rights under the Due Process Clause of the Fifth Amendment and under the Ninth Amendment. The Patient–Plaintiffs assert that the rights to maintain bodily integrity, alleviate pain and suffering, and control the circumstances of one's own death, though unenumerated in the Bill of Rights, are deeply rooted in our nation's history. They contend that Defendants' interference with the Compassionate Use Act of 1996 impermissibly infringes on these fundamental rights, which the Patient–Plaintiffs exercise by cultivating and using marijuana for medicinal purposes. When the government impairs the exercise of a fundamental right, courts apply a strict scrutiny standard under which the government must demonstrate a compelling interest for its actions, not merely a rational relationship between the statute at issue and permissible state objectives. *See*

*Shapiro v. Thompson,* 394 U.S. 618, 627–35, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The Patient–Plaintiffs argue that the government's actions fail to survive the strict level of scrutiny that applies to violations of cognizable fundamental rights.[5]

Plaintiffs rely in part upon *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 281, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), and other Supreme Court decisions that have recognized a fundamental right to maintain bodily integrity. The analysis in *Cruzan,* in which the Supreme Court presumed the existence of a constitutionally protected liberty interest in refusing unwanted medical treatment, was based on a long line of earlier cases recognizing such a right. The fundamental right to maintain bodily integrity protects against unjustified invasions of one's body by the state. Nowhere in this line of cases, however, is there explicit or even implicit support for the proposition that there is a constitutionally protected right to alleviate one's pain and suffering or control the circumstances of one's own death by using a controlled substance.

The Supreme Court's decision in *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), provides a stronger basis for Plaintiffs' fundamental rights argument. In *Glucksberg,* the Supreme Court ruled that a mentally competent, terminally ill adult does not have a fundamental right to commit physician-assisted suicide. The court held that only fundamental rights or interests that are "deeply rooted in this Nation's history and tradition" are constitutionally protected under the substantive due process doctrine and thus qualify for anything other than rational basis review, and that such rights must be "carefully described."[6] *Id.*

---

**5.** The fact that California law does not prohibit the use of marijuana for medicinal purposes under certain circumstances is not determinative of whether the Patient–Plaintiffs have a fundamental right to use it. *See United States v. Cannabis Cultivator's Club,* No. C–98–

00085 CRB, etc., 1999 WL 111893, *2 (N.D.Cal. Feb.25, 1999).

**6.** Plaintiffs note that use of marijuana for medicinal purposes has been in conflict with federal law only for the last thirty-three years

at 721, 117 S.Ct. 2258. Plaintiffs assert, however, that dicta in four concurring opinions in *Glucksberg* support their claim that the Patient–Plaintiffs have a fundamental right to use physician-recommended medication to alleviate their pain and suffering and to control the circumstances of their own deaths.

In her concurring opinion, in which Justice Ginsburg joined, Justice O'Connor found "no need to address the question whether suffering patients have a constitutionally cognizable interest in obtaining relief from the suffering that they may experience in the last days of their lives." *Id* at 737, 117 S.Ct. 2258. This statement in particular suggests that these two justices have not foreclosed the possibility of recognizing a fundamental right of a terminally ill person to alleviate his or her pain and suffering. Justice Stevens stated in his concurrence that the liberty interest in refusing unwanted medical treatment recognized in *Cruzan* embraces the individual's "interest in dignity, and in determining the character of the memories that will survive long after death." *Id.* at 743, 117 S.Ct. 2258. Justice Stevens further concluded that "[a]voiding intolerable pain and the indignity of living one's final days incapacitated and in agony" is a fundamental right. *Id.* at 745, 117 S.Ct. 2258. Justice Souter recognized that a person's "liberty interest in bodily integrity [includes] a right to determine what shall be done with his own body in relation to his medical needs." *Id.* at 777, 117 S.Ct. 2258. And Justice Breyer stated in his concurrence that any fundamental right to die with dignity includes a right to "the avoidance

of unnecessary and severe physical suffering." *Id.* at 790, 117 S.Ct. 2258.

Arguably, the four concurring opinions in *Glucksberg,* which represent the views of five Supreme Court justices, demonstrate that a majority of the current Supreme Court has not foreclosed the possibility of recognizing a fundamental right of a terminally person to use physician-recommended medication to alleviate his or her pain and suffering and to control the circumstances of his or her own death. Plaintiffs, however, ask this Court not only to recognize such a right but also to find the right applicable to terminally ill persons who desire to use and cultivate a controlled substance. None of the concurring opinions in *Glucksberg* can be read so expansively. Nor can the application of the right Plaintiffs seek logically be limited to the use of medicinal marijuana; as framed, it would permit a terminally ill person to use and cultivate any substance[7], regardless of whether Congress or the DEA has determined that it has any medically-established or scientifically-supported benefit, as long as he or she could find a physician to recommend that he or she do so. Such a broadly-defined right is not supported by "our Nation's history, legal traditions, and practices." *Id.* at 710, 117 S.Ct. 2258.

Even assuming without deciding that there may be a more limited fundamental right or interest of terminally ill persons to alleviate their pain and suffering or to control the circumstances of their deaths by using a physician-recommended medication that has some medically-established benefit, Congress and the DEA have determined that marijuana is not such a medication.[8] The Court acknowledges

---

of the 227 years since the signing of the Declaration of Independence, and that multiple states have endorsed medicinal use of marijuana.

**7.** By extension, the fundamental right that Plaintiffs urge this Court to recognize would include the right to use other controlled sub-

stances that alleviate pain and suffering such as heroin and morphine.

**8.** The Court recognizes that the State of California, as well as the City and County, have determined that marijuana has medicinal benefits and legally may be used for medicinal purposes. The federal government, however,

that the current assignment of marijuana to Schedule I of the CSA is a matter about which reasonable people may differ. *See Conant*, 309 F.3d at 640–42 (Kozinski, J., concurring) ("A surprising number of health care professionals and organizations have concluded that the use of marijuana may be appropriate for a small class of patients who do not respond well to, or do not tolerate, available prescription drugs," and numerous "studies and surveys support the use of medical marijuana in certain limited circumstances."). However, the Supreme Court, exhibiting great deference to Congressional judgment that marijuana appropriately is assigned to Schedule I of the CSA, rejected essentially the same argument that Plaintiffs advance here—that marijuana can be deemed medically necessary despite its inclusion on Schedule I—in *Oakland Cannabis Buyers' Cooperative*, 532 U.S. at 493, 121 S.Ct. 1711.

Existing law provides a clear non-judicial process by which Plaintiffs and others may seek to establish the lawful use of marijuana for medicinal purposes: they may petition the DEA to reschedule marijuana from Schedule I of the CSA. Indeed, there have been several attempts to reschedule marijuana; all were unsuccessful, and each denial of a rescheduling petition

has concluded otherwise. Under the Supremacy Clause and the doctrine of separation of powers, this Court may not substitute its judgment about the benefits of the medication at issue for the judgment of the legislative and executive branches of the federal government. In the present case, this Court would have to look behind the Congressional declarations and findings in the CSA as well as the administrative determinations of the DEA, consider and weigh conflicting evidence presented by Plaintiffs and the government regarding the medicinal benefits of marijuana, and conclude that Congress' determination as expressed in the CSA that marijuana has "no currently accepted medical use" is incorrect.

by the DEA has been upheld by the United States Court of Appeals for the District of Columbia Circuit. *See National Org. for the Reform of Marijuana Laws v. Ingersoll*, 497 F.2d 654 (D.C.Cir.1974); *National Org. for the Reform of Marijuana Laws v. Drug Enforcement Admin.*, 559 F.2d 735 (D.C.Cir.1977); *National Org. for the Reform of Marijuana Laws v. Drug Enforcement Admin. & Dep't of Health, Education & Welfare*, No. 79–1660 (D.C.Cir. Oct. 16, 1980); *Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 930 F.2d 936 (D.C.Cir.1991); *Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 15 F.3d 1131 (D.C.Cir.1994).[9]

Plaintiffs submit compelling declarations that medicinal marijuana is the best means for certain Patient–Plaintiffs to avoid debilitating pain and suffering. Defendants do not dispute this evidence, but they note that the Patient–Plaintiffs only are deprived of the right to use a specific type of treatment and are not deprived of the recognized right to treatment generally.[10] While Plaintiffs claim that marijuana is the *only* means for certain Patient–Plaintiffs to avoid extreme pain and suffering, the record does not necessarily support that conclusion. The fact that the Patient–Plaintiffs have experienced relief from pain as a result of their marijuana use does not mean that other, legal, means of pain relief are unavailable.[11]

9. In 2002, the District of Columbia Circuit dismissed for lack of standing a petition for review of a DEA order denying the plaintiffs' petition to initiate rulemaking proceedings to reschedule marijuana. *See Gettman v. Drug Enforcement Admin.*, 290 F.3d 430 (D.C.Cir. 2002).

10. For example, Plaintiffs are not precluded from obtaining and using Marinol (dronabinol), a synthetic version of tetrahydrocannabinol (THC), which is one of the principal active compounds found in marijuana.

11. The relative efficacy of various means of pain relief is a matter for the legislative and executive branches of government to decide.

In *Carnohan v. United States*, 616 F.2d 1120 (9th Cir.1980) (per curiam), the United States Court of Appeals for the Ninth Circuit held that there is no constitutionally protected right to obtain medication, whether unproven or not, free from the lawful exercise of the government's powers. The court affirmed the dismissal of a declaratory relief action in which the plaintiff, proceeding *pro se*, sought to secure the right to obtain and use laetrile, a nonapproved drug for the prevention of cancer, without FDA approval. It held that "[c]onstitutional rights of privacy and personal liberty do not give individuals the right to obtain laetrile free of the lawful exercise of government police power." *Id.* at 1122. The court relied on the reasoning set forth in *Rutherford v. United States*, 616 F.2d 455 (10th Cir.1980), *cert. denied*, 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980), in which the United States Court of Appeals for the Tenth Circuit held that "the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health." *Id.* at 457.[12]

Plaintiffs point out the court in *Carnohan* expressly did "not decide whether Carnohan has a constitutionally protected right to treat himself with home remedies of his own confection," *id.* at 1122, and that in fact the marijuana that Plaintiffs seek to use for medicinal purposes is of their "own confection." Defendants, however, observe that every other court in this circuit to consider a similar argument concerning marijuana has held that there is no fundamental right to cultivate or possess marijuana for medicinal use. *See, e.g., Raich v. Ashcroft*, 248 F.Supp.2d 918, 928 (N.D.Cal.

2003) ("While Plaintiffs may vehemently disagree with the wisdom of the federal government's determination that marijuana has no medical efficacy ... they do not have a fundamental, constitutional right to obtain and use it for treatment."). Because it concludes that the fundamental right articulated by Plaintiffs—the right of terminally ill persons to use physician-recommended medication to alleviate their pain and suffering and to control the circumstances of their own deaths—is not "deeply rooted in this Nation's history and tradition" and that recognition of such a constitutionally-protected right under the circumstances of this case would be inconsistent with the holding of *Carnohan*, this Court concludes that Plaintiffs cannot demonstrate a likelihood of success on this aspect of their claim.

### b. Fundamental Right to Follow the Recommendations of One's Physician

■ Plaintiffs next claim that Defendants' actions violate the Patient–Plaintiffs' fundamental right to follow the recommendations of their respective physicians in treating their illnesses. The Patient–Plaintiffs have submitted evidence that physicians have recommended that they use marijuana for medicinal purposes, and they contend that Defendants' actions will erode their physician-patient relationships.

Plaintiffs rely on *Conant*, in which the Ninth Circuit substantially upheld a district court's order that enjoined the federal government from revoking a physician's license to prescribe controlled substances or conducting an investigation of a physician where the basis for the government's

---

**12.** The *Carnohan* court also cited with approval *People v. Privitera*, 23 Cal.3d 697, 153 Cal.Rptr. 431, 591 P.2d 919 (1979), *cert. denied, Privitera v. California*, 444 U.S. 949, 100 S.Ct. 419, 62 L.Ed.2d 318 (1979), in which the California Supreme Court refused to recognize a fundamental right to use laetrile.

action was the physician's professional recommendation of the use of marijuana for medicinal purposes. 309 F.3d at 639. The permanent injunction at issue in *Conant* was entered to protect the First Amendment right of the plaintiff doctors, *id.* at 632; it did not establish any right to use or obtain marijuana for medicinal purposes. Plaintiffs emphasize that the Ninth Circuit recognized the importance of the physician-patient relationship: "An integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Id.* at 636. However, notwithstanding Judge Kozinski's thoughtful concurring opinion, *Conant*'s relevance to the present case is unclear. Plaintiffs have not alleged any violation of First Amendment rights, and *Conant* does not go so far as to support Plaintiffs' position that the Patient–Plaintiffs have the right to follow their physicians' recommendations to use medicinal marijuana.[13]

The Court is unaware of any authority that recognizes a fundamental right of patients to follow the recommendations of their physicians in treating their illnesses or to obtain and use physician-recommended medications in situations where the use of such medications is prohibited by law. Indeed, "if one does not have a right to obtain medication free from government regulation, there is no reason why one would have that right upon a physician's recommendation." *United States v. Cannabis Cultivator's Club*, No. C–98–00085 CRB, etc., 1999 WL 111893, *2 (N.D.Cal. Feb.25, 1999). Plaintiffs cannot

demonstrate a likelihood of success on this claim under existing law.

**c. Unlawful Exercise of Congressional Power Under the Commerce Clause**

■ The announced purpose of the September 5, 2002 raid was to enforce federal law as set forth in the Controlled Substances Act. As discussed above, the CSA prohibits the manufacture, distribution, dispensation, possession with intent to distribute, and simple possession of marijuana. *See* 21 U.S.C. § 841(a). The CSA was enacted pursuant to the authority of Congress under the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, pursuant to which Congress may regulate those activities that "substantially affect" interstate commerce. *United States v. Lopez*, 514 U.S. 549, 559, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

Plaintiffs argue that application of the CSA to wholly intrastate, non-economic activities that are authorized expressly by state and local governments constitutes an unlawful exercise of Congressional powers under the Commerce Clause.[14] The Supreme Court expressly reserved this issue in *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 495 n. 7, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) ("Nor are we passing today on a constitutional question, such as whether the Controlled Substances Act exceeds Congress' power under the Commerce Clause."). Plaintiffs contend that the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v.*

---

**13.** The government has filed a petition for writ of certiorari asking the Supreme Court to reverse the holding in *Conant*.

**14.** Plaintiffs have submitted evidence that WAMM members cultivate and use marijuana

only for medicinal purposes, that they do so only within California, that they use and transport marijuana for medicinal purposes only within California, and that they neither purchase nor sell marijuana. *See* Corral Decl. ¶¶ 11, 13, 20.

*Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), support their position.

In *Lopez,* the Supreme Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), which prohibited possession of a firearm within 1,000 feet of a school, as an unconstitutional exercise of Congressional power under the Commerce Clause. The Court found that § 922(q) had nothing to do with commerce or any sort of economic enterprise, that it failed to require that the firearm possession in question actually affect interstate commerce, and that it did not contain any formal findings regarding the effect on interstate commerce of the firearm possession in question. 514 U.S. at 561–63, 115 S.Ct. 1624. The Court warned that Congressional power under the Commerce Clause power "is subject to outer limits." *Id.* at 557, 115 S.Ct. 1624. At the same time, it reaffirmed that " 'where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.' " *Id.* at 558, 115 S.Ct. 1624 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)). Five years later, the Court held in *Morrison* that in creating a civil remedy for victims of gender-motivated violence under the Violence Against Women Act, 42 U.S.C. § 13981, Congress again impermissibly had exceeded its authority under the Commerce Clause. That decision was based on the Court's conclusion that, despite Congressional findings regarding the economic effect of gender-motivated crimes of violence (which the Court deemed inadequate), intrastate violence against women is not economic activity and does not "substantially affect" interstate commerce. 529 U.S. at 613–615, 120 S.Ct. 1740.

This Court considered and rejected a similar Commerce Clause argument made by the movants in the related case. *See Wo/Men's Alliance for Med. Marijuana v. United States,* No. 02–MC–7012 JF, 2002 U.S. Dist. LEXIS 26389 (N.D.Cal. Dec. 3, 2002). In *Wo/Men's Alliance for Medical Marijuana,* the Court concluded that Ninth Circuit precedent precluded the movants from prevailing on their Commerce Clause challenge. In particular, the Court determined that it was bound by *United States v. Visman,* 919 F.2d 1390 (9th Cir.1990), *cert. denied, Visman v. United States,* 502 U.S. 969, 112 S.Ct. 442, 116 L.Ed.2d 460 (1991), which addressed cultivation of marijuana explicitly. *Id.* at *9. *See also United States v. Rodriquez– Camacho,* 468 F.2d 1220, 1221–22 (9th Cir. 1972), *cert. denied, Rodriquez–Camacho v. United States,* 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973). In *Visman,* the Ninth Circuit upheld the defendant's conviction for cultivation and possession of marijuana against a Commerce Clause challenge.

[*Visman* ] holds unambiguously that "Congress may constitutionally regulate intrastate criminal cultivation of marijuana plants found rooted in the soil ..." and that "local criminal cultivation of marijuana is within a class of activities that adversely affects interstate commerce." 919 F.2d at 1393. While it was decided before *United States v. Lopez* (citation omitted) and *United States v. Morrison* (citation omitted), in which the Supreme Court sustained challenges to federal statutes passed pursuant to the Commerce Clause, *Visman* is still the law in the Ninth Circuit, and it was cited with express approval in *United States v. Kim,* 94 F.3d 1247, 1250 (9th Cir.1996), which was decided after *Lopez.*

*Wo/Men's Alliance for Med. Marijuana,* 2002 U.S. Dist. LEXIS 26389 at *9–10. The Ninth Circuit has affirmed the constitutionality of the CSA under the Com-

merce Clause in two other post-*Lopez* decisions. *See United States v. Bramble,* 103 F.3d 1475, 1479 (9th Cir.1996); *United States v. Tisor,* 96 F.3d 370, 375 (9th Cir. 1996), *cert. denied, Tisor v. United States,* 519 U.S. 1140, 117 S.Ct. 1012, 136 L.Ed.2d 889 (1997). Defendants note that eleven other courts of appeal also have upheld the constitutionality of various provisions of the CSA against Commerce Clause challenges.

In March 2003, Judge Martin Jenkins of this district also considered and rejected the argument that federal prohibition of medicinal marijuana under the CSA is an impermissible expansion of Congress' power under the Commerce Clause. *See Raich v. Ashcroft,* 248 F.Supp.2d 918 (N.D.Cal.2003). Judge Jenkins held that "the decision in *Morrison* is insufficiently on point to permit this Court to overrule the *Visman, Rodriquez–Camacho,* and *Tisor* line of cases." *Id.* at 925–26. He concluded that:

> In the final analysis, neither *Lopez* nor *Morrison* answer definitively the question posed to this Court: whether the Controlled Substances Act, as applied in this case, is beyond the purview of Congress' power to regulate activity under the Commerce Clause. Therefore, the Court is still bound by existing Ninth Circuit authority on this issue.

*Id.* at 926.

Shortly after the decision in *Raich,* the Ninth Circuit decided *United States v. McCoy,* 323 F.3d 1114 (9th Cir.2003).[15] In *McCoy,* the defendant had entered a conditional guilty plea to a violation of 18 U.S.C. § 2252(a)(4)(B), which prohibits possession of child pornography produced using materials that have traveled in interstate commerce. The visual depiction at issue was a single photograph of the defendant and her minor daughter posing partially un-

clothed with their genital areas exposed. On appeal, the Ninth Circuit held the statute unconstitutional under the Commerce Clause as applied to simple intrastate possession of a photograph that had not traveled in interstate commerce and was not intended for interstate distribution or any economic use. *Id.* at 1115.

Plaintiffs contend that the *McCoy* decision supports their position and mandates that this Court apply *Morrison*'s four-part test for determining whether their activities "substantially affect" interstate commerce. The elements of the *Morrison* test are:

> 1) whether the statute in question regulates commerce "or any sort of economic enterprise"; 2) whether the statute contains any "express jurisdictional element which might limit its reach to a discrete set" of cases; 3) whether the statute or its legislative history contains "express congressional findings" that the regulated activity affects interstate commerce; and 4) whether the link between the regulated activity and a substantial affect on interstate commerce is "attenuated."

*Id.* at 1119 (citing *Morrison,* 529 U.S. at 610–612, 120 S.Ct. 1740).

Applying the *Morrison* test, the *McCoy* court concluded that § 2252(a)(4)(B) "does not regulate activity that is economic or commercial in nature"; that the statute's jurisdictional element "does not serve to limit application of the statute to a discrete set of cases that have a substantial effect on interstate commerce"; that the statute's findings and the legislative history do not support the government's position; and that "[t]he relationship between purely intrastate non-commercial possession of prohibited home-grown depictions and the

---

**15.** The Ninth Circuit has denied the government's petition for rehearing and suggestion for rehearing en banc regarding the *McCoy* decision.

highly commercial interstate activity engaged in by the 'multi-million dollar industries' involved is highly attenuated at best." *Id.* at 1129–30. Plaintiffs argue that the CSA's prohibition on manufacture and distribution of marijuana similarly is unconstitutional as applied to their wholly intrastate, non-economic activities, a discrete class of activities that are authorized expressly by state and local governments.[16] They note that the Ninth Circuit did not apply the four-part *Morrison* test in *Visman* or the other decisions relied upon by Defendants. Plaintiffs contend that *McCoy* and *Morrison* require that Defendants demonstrate that the particular activity at issue here "substantially affects interstate commerce."

However, the *McCoy* panel expressly distinguished § 2252(a)(4)(B) from the CSA:

> [The CSA] contains express legislative findings regarding the relationship between purely intrastate activities and interstate commerce. [ ] It is primarily on the basis of these congressional findings that we rejected Commerce Clause challenges to the Act. We express no view, however, as to the effect of *Morrison* on these cases.

*Id.* at 1128 n. 24. The court also concluded that the photograph depicting child pornography at issue was not a fungible item. *Id.* at 1122. In contrast, Congress expressly has declared that controlled substances, including marijuana, are fungible items for purposes of interstate commerce. Congress has concluded that because "[c]ontrolled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate," it is "not feasible" to distinguish between them. 21 U.S.C. § 801(5). Similarly, in *United States v. Cannabis Cultivators Club*, 5 F.Supp.2d 1086 (N.D.Cal.1998), the district

court found that "there is nothing in the nature of medical marijuana that limits it to intrastate cultivation." *Id.* at 1098.

Applying the *Morrison* test to the present case, the Court concludes that Congress has not exceeded its power under the Commerce Clause. With respect to the first factor—whether the statute regulates commerce or any economic activity—the analysis depends upon how the class of activity under scrutiny is defined. Plaintiffs contend that the relevant class of activity is intrastate cultivation of marijuana for medicinal purposes pursuant to the recommendation or approval of a physician in compliance with California's medicinal marijuana statute. This definition is problematic, however, because its application depends upon whether a state has enacted legislation inconsistent with the CSA. Put another way, if Plaintiffs' Commerce Clause claim were upheld on the basis of this definition, the CSA would be unconstitutional as applied to Plaintiffs and similarly situated individuals in Alaska, Arizona, California, Colorado, Hawaii, Nevada, Oregon, Washington, and other states that have enacted legislation approving the use of medicinal marijuana, but presumably would be constitutional as applied to similarly situated individuals who happen to reside in a state where intrastate possession or cultivation of marijuana for medicinal purposes is unlawful. The proper class of activity here thus must be limited to intrastate cultivation or possession of marijuana for medicinal purposes, regardless of whether a state or local government has legalized such cultivation or possession.

Even this definition is problematic, however, because law enforcement officials may not be able to determine the purpose for which a given marijuana plant is being grown. Nonetheless, using this definition of the relevant class of activity,

---

**16.** Plaintiffs also request that the Court con- sider their specific, actual use of marijuana.

the declarations and findings of Congress in adopting the CSA make clear that Congress considers such activity to have a substantial effect on interstate commerce because controlled substances are fungible items that influence and contribute to a national black market for controlled substances regardless of the purposes for which they are used.[17] *See* 21 U.S.C. § 801(3)-(6). Unlike the statute at issue in *Lopez,* the CSA "is an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624. The first factor of the four-part *Morrison* test thus favors Defendants.

The second factor—whether the statute contains any express jurisdictional element—clearly favors Plaintiffs because the CSA contains no such provision. The third factor—the presence of Congressional findings—favors Defendants. While the presence of formal declarations and findings in the CSA is not determinative, and while those findings are general and do not address precisely the narrowly defined conduct in which Plaintiffs engage, this Court cannot conclude that the findings are inadequate as a matter of law when the Ninth Circuit repeatedly has confirmed their rationality and has approved or deferred to them. The fourth factor— whether the link between the regulated activity and a substantial affect on interstate commerce is attenuated—arguably favors Plaintiffs. The Ninth Circuit has stated in dicta that "[m]edical marijuana, when grown locally for personal consumption, does not have any direct or obvious

effect on interstate commerce." *Conant,* 309 F.3d at 647.

Because the first factor, which is "ordinarily the most important" one, *McCoy,* 323 F.3d at 1129, and the third factor, which this Court finds to be equally important, favor Defendants, the Court concludes that application of the *Morrison* test results in a legal conclusion that the targeted activity "substantially affects" interstate commerce. Put differently, *McCoy* does not change this Court's earlier conclusion in *Wo/Men's Alliance for Medical Marijuana* that the Court is bound by existing Ninth Circuit authority on this issue. *See also Raich,* 248 F.Supp.2d at 926. Accordingly, Plaintiffs cannot demonstrate a likelihood of success on their claim that application of the CSA to their conduct constitutes an unlawful exercise of Congressional powers under the Commerce Clause.

**d. Violation of Tenth Amendment**

▮ Plaintiffs' final claim is that Defendants' actions infringe upon the general police powers of the state and its subdivisions under the Tenth Amendment to provide for the health and safety of their citizens. It is well-established that "[each state] retains broad regulatory authority to protect the health and safety of its citizens." *Maine v. Taylor,* 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). Plaintiffs contend that the Compassionate Use Act of 1996 and the medicinal marijuana ordinances enacted by the City and County fall squarely within the police powers reserved to the states and their subdivisions and that Defendants' interference with the statute thus violates the Tenth Amendment.[18]

---

**17.** The "cumulative effect" principle established by the Supreme Court in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), permits Congress to regulate an entire class of acts under the Commerce Clause if the class has a substantial economic

effect on interstate commerce without regard to whether a particular act would not have such an effect.

**18.** *See* note 2, *supra.*

Plaintiffs make two arguments in support of their Tenth Amendment claim. First, they contend that because the September 5, 2002 raid and seizure and other federal enforcement of the CSA was undertaken pursuant to an unlawful exercise of Congressional powers under the Commerce Clause, Defendants' actions necessarily violate the Tenth Amendment. As discussed above, the Court concludes that under existing Ninth Circuit authority Plaintiffs cannot prevail on their claim that application of the CSA to their activities constitutes an unlawful exercise of Congressional powers under the Commerce Clause. "The Supreme Court has held that a valid exercise of Commerce Clause authority that displaces States' exercise of their police powers or curtails the States' ability to legislate on matters they may consider important does not constitute an invasion of sovereign areas reserved to the States by the Tenth Amendment." *Raich,* 248 F.Supp.2d at 927 (citing *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 291, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). *See also New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("if a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States"). The Ninth Circuit held in *Kim* that the defendants' "argument that § 841(a)(1) intrudes into an area traditionally regulated by states lacks merit." 94 F.3d at 1250 n. 4. This aspect of Plaintiffs' Tenth Amendment claim rises and falls with their Commerce Clause challenge.

Second, Plaintiffs claim that Defendants impermissibly have commandeered the state legislative process and conscripted state officers to carry out the September 5, 2002 raid. "[T]he [f]ederal [g]overnment may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States,* 521 U.S. 898, 925, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (invalidating provision of the Brady Handgun Violence Prevention Act). Nor may Congress "circumvent that prohibition by conscripting the State's officers directly." *Id.* at 935. However, this is not a case in which the federal government has "commandeered" the state legislative process by requiring the state legislature to enact a particular kind of law, because it is not forcing the state to take any action. Although they assert that Defendants conscripted state officers because the DEA task force that carried out the September 5, 2002 raid included officers from the San Jose Police Department and the Santa Clara County Sheriff's Department, Plaintiffs have not established that state officers were required or compelled to participate in the raid. Indeed, San Jose's Chief of Police withdrew his officers from the DEA task force after the September 5, 2002, raid. *See* Declaration of Gerald Uelman ("Uelman Decl.") ¶ 15. Plaintiffs do not allege that the San Jose Police Department or its chief were punished by the federal government for this action[19], and Defendants assert that the state voluntarily chose to participate in the DEA task force.

Because Plaintiffs cannot prevail on their Commerce Clause challenge and have

---

**19.** As a result of its withdrawal from the DEA task force, the San Jose Police Department apparently became ineligible for funding and other resources that it would have received had it continued to participate. *See* Uelman Decl. ¶ 15. However, there is no evidence that the department was in any way required to participate in the task force or that it suffered any detriment beyond the loss of an opportunity to be compensated and to receive certain tactical support and information from the DEA for its participation.

not established that Defendants commandeered the state legislative process or conscripted state officers, the Court concludes that they cannot demonstrate a likelihood of success on their Tenth Amendment claim.

## B. Motion to Dismiss

Defendants move to dismiss Claims 1 and 2 of Plaintiffs' complaint (for injunctive and declaratory relief for deprivation of fundamental rights under the Fifth and Ninth Amendments) because Plaintiffs cannot succeed on their fundamental rights argument. They move to dismiss Claims 3 and 4 (for injunctive and declaratory relief based upon unlawful exercise of Congressional powers under the Commerce Clause and violation of the Tenth Amendment) because Plaintiffs cannot succeed on their Commerce Clause or Tenth Amendment challenges. For the reasons discussed above, the Court concludes that Plaintiffs cannot succeed on these claims as currently pled under existing Ninth Circuit authority.[20] Accordingly, the motion is well-taken as to Claims 1-4 of Plaintiffs' complaint.[21]

■■■ Defendants also move to dismiss Claim 5, which seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Plaintiffs' actions are protected from civil or criminal liability under the CSA by 21 U.S.C. § 885(d). Plaintiffs contend that WAMM and Valerie Corral are immune from lia-

bility by virtue of the Santa Cruz City Council having adopted a resolution in December 2002 deputizing WAMM and the Corrals to function as City-authorized medicinal marijuana providers pursuant to the City's medicinal marijuana ordinance.

■■■ Because Plaintiffs name individual government employees acting in their official capacities as defendants, the instant action is one against the United States. *Lehman v. Jacobosky*, No. C-97-1968 FMS, 1997 WL 573426, at *3 (N.D.Cal. Sept.9, 1997); *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir.1989). However, the United States and its employees, sued in their official capacities, are immune from suit unless sovereign immunity has been waived. *Kentucky v. Graham*, 473 U.S. 159, 165-67, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Declaratory Judgment Act confers jurisdiction to hear the subject matter of a claim but it does not constitute a waiver of the sovereign immunity of the United States. *Benvenuti v. Dep't of Defense*, 587 F.Supp. 348, 352 (D.D.C.1984). Plaintiffs have not demonstrated a waiver of sovereign immunity by Defendants.

Even if Defendants had waived sovereign immunity, Plaintiffs' claim that their actions are protected from civil or criminal liability under 21 U.S.C. § 885(d), a statute intended to provide immunity for acts committed by law enforcement officers in the course of legitimate drug enforcement op-

---

**20.** Defendants also argue that WAMM and Valerie Corral are barred from asserting Claims 1-4 because they unsuccessfully litigated a Commerce Clause claim in *Wo/Men's Alliance for Medical Marijuana v. United States*, No. 02-MC-7012 JF, 2002 U.S. Dist. LEXIS 26389 (N.D.Cal. Dec. 3, 2002). In light of its disposition of Plaintiffs' motion for preliminary injunction, the Court need not address this argument.

**21.** Plaintiffs request that the Court take judicial notice of certain documents in support of

their opposition to Defendants' motion to dismiss. The documents at issue appear in scholarly texts, an official report of the Ohio State Medical Committee on Cannabis Indica, and a California State Senate Rules Committee bill analysis. The Court concludes that these documents are appropriate for judicial notice and therefore overrules Defendants' objection to Plaintiffs' request. Defendants do not object to Plaintiffs' request that the Court take judicial notice of certain documents in support of their motion for preliminary injunction.

erations, is fatally defective. Judge Charles Breyer of this district rejected the same argument in *United States v. Cannabis Cultivator's Club, et al.*, No. C–98–00085 CRB, etc., slip op. at 2–5 (N.D.Cal. Sept. 3, 1998), Ex. 2 to Defendants' Motion to Dismiss, finding that any other result "would mean that a state or municipality could exempt itself from the Controlled Substances Act." *Id.* at 4. The Court finds the reasoning set forth by Judge Breyer applicable to the present case because the City's medicinal marijuana ordinance is in positive conflict with the CSA. Accordingly, Claim 5 will be dismissed. Defendants' motion will be granted with leave to amend as to all claims asserted against them.

## IV. CONCLUSION

This Court is acutely mindful of the suffering of the Patient–Plaintiffs and of the evidence that medicinal marijuana has helped to alleviate that suffering. As it commented at oral argument, the Court finds the declarations of the Patient–Plaintiffs deeply moving. The voters of California and the governing bodies of the City and County of Santa Cruz have made a clear legislative judgment that seriously ill patients should be permitted to use marijuana for medicinal purposes in compliance with the Compassionate Use Act of 1996. However, the legislative and executive branches of the federal government have a different view, and in a federal system that view is controlling unless the federal government is acting in excess of its constitutional powers. Although Plaintiffs have made a significant showing of irreparable injury, the Court, as was the case in *Wo/Men's Alliance for Medical Marijuana*, has no alternative but to conclude that under existing law they cannot succeed on

the merits of their claims. One reasonably may challenge through the legislative, administrative, and political processes the judgment of Congress and the DEA that marijuana has no medicinal value. However, it is not the role of federal courts, and in particular federal district courts, to impose their own policy judgments even in the most sympathetic of circumstances, especially where the legislative and executive branches of the federal government repeatedly have reaffirmed the policy at issue.

Good cause therefore appearing, IT IS HEREBY ORDERED that Plaintiffs' motion for preliminary injunction is DENIED. Because the Court concludes that Plaintiffs cannot succeed on the merits of their claims as presently pled, Defendants' motion to dismiss Plaintiffs' complaint is GRANTED with leave to amend. Any amended complaint shall be filed within ninety (90) days of the date of this order.[22]

---

22. The Court notes that oral argument before the Ninth Circuit on the appeal from the decision in *Wo/Men's Alliance for Medical Marijuana* is scheduled for mid-September 2003. Pending disposition of that appeal,

Plaintiffs may wish to amend their complaint. If Plaintiffs elect not to amend their complaint and seek entry of judgment, they should notify the Court accordingly.